**CURTO v. INTERNATIONAL LONGSHORE-MEN'S & WAREHOUSEMEN'S UNION (CIO), etc., et al.**

**ROSALES v. INTERNATIONAL LONG-SHOREMEN'S & WAREHOUSEMEN'S UNION (CIO), etc., et al.**

**HAWAIIAN PINEAPPLE CO., Ltd. v. INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION (CIO), etc., et al.**

Nos. 5104, 5105 and 5183.

United States District Court
D. Oregon.

Sept. 2, 1952.

Gunther F. Krause and Dennis J. Lindsay, of Portland, Or., for the plaintiffs.

George R. Andersen and Norman Leonard, of San Francisco, Cal., and John F. Conway, of Portland, Or., for the defendants.

JAMES ALGER FEE, Chief Judge.

At a trial before a single jury, three cases were presented which actually involved the trial of four major issues. Before trial a pretrial conference had been held and a pretrial order adopted, which developed these issues and covered the whole field. On the cause of action by Hawaiian Pineapple Company, Ltd. (hereinafter designated as "Pineapple") against International Longshoremen's & Warehousemen's Union (hereinafter called "International") and International Longshoremen's & Warehousemen's Union, Local 8 (hereinafter called "Local"), there was a recovery of approximately two hundred thousand dollars. Upon the issues set up by Pineapple against International, Local and various individual longshoremen upon the ground of illegal interference with commerce between the mainland and Hawaii and with interstate transportation of the same cargo, brought about by a conspiracy to prevent the handling and movement of goods of Pineapple, there was a verdict for the defendants. In each of the actions by two truckers employed by Pineapple against various longshoremen for assault and battery, there was a verdict in damages and in punitive damages.

A number of special policemen were hired for the purpose of maintaining order and protecting the property of the port. The city of The Dalles, to the limits of which the port adjoins, employed these police. As a result of these and other activities of the members of Local, Pineapple was unable to have the cargo unloaded or transported to its subsidiary in California, although arrangements had been made with the Port of The Dalles, the Union Pacific Railroad, various trucking concerns and Goodat Crane Company for the unloading and transportation thereof.

The evidence tended to show the situation which will be hereinafter set out. Owing to a tie-up of transportation from Hawaii caused by the activity of Internation-

al and affiliated local unions in the Territory, Pineapple, in order to convey a cargo worth approximately half a million dollars, which was intended ultimately for a processing plant owned by a subsidiary in California, had chartered the navy barge YFN624, which was loaded with facilities and by employees of Isleways, Ltd., a wholly owned subsidiary. This barge was towed across to the mainland by the ocean going tug "Ona," owned by Isleways. Upon arrival of the barge in the harbor of Tacoma, Washington, it was impossible to unload the cargo there, owing to resistance among labor groups in that port, engendered directly or indirectly by International. Thereafter the barge was turned over to a river tow boat by the Ona and was brought up the Columbia River ninety miles past Portland to The Dalles, Oregon, on September 24, 1949. Before its arrival there, Matt Meehan, who was a representative of International in the area, engaged in a series of conferences with officials of the Port of The Dalles, wherein he insisted that the cargo be not unloaded and that the facilities be not furnished to the barge. His address was truculent and aggressive. An Hawaiian, claimed to be a member of a local union there affiliated with International, was flown from the islands and arrived at The Dalles. There were meetings of the members of Local in its hall at Portland, Oregon, at which Meehan was present and took part in the discussion. The next morning members of Local, to the number of from two hundred fifty to four hundred, proceeded in small groups by private cars to The Dalles, a distance of ninety miles. There members of Local and the Hawaiian formed a picket line outside of the dock of the Port of The Dalles, a municipal corporation.

After the picket line had been maintained for some days, certain of the longshoremen, hearing of the approach from outside the state, of teamsters belonging to a local teamsters union in California but who were engaged by Pineapple, met these employees at a point several miles from the dock, gave them an outline of conditions there and attempted to prevent their going further. However, two trucks went upon the dock in the morning and, when one of these had been loaded, the supervisor drove out and led two other trucks with drivers and helpers through the picket line and into the dock enclosure. Thereupon, in a riotous, threatening and violent manner, the longshoremen broke through the cordon of local police and rushed onto the dock. Some of them assaulted each of these employees of Pineapple. Two, in particular, were set upon by the longshoremen, who kicked them, beat them, and threatened them with death. The truck drivers were thus coerced into submission and, under threat of death or great bodily harm, promised not to interfere further. The four trucks returned to California empty.

The longshoremen, who rushed upon the dock at the time, proceeded to the dock's edge, having armed themselves with various weapons which they were able to pick up,[1] attempted to damage a crane and threw some four hundred cases of pineapple into the Columbia River and attempted ineffectually to set the barge adrift. Thereafter, the longshoremen were recalled from the dock and gathered in a group outside the boundaries of the Port, where they were addressed by Meehan, who is said to have complimented them upon the meas-

---

1. James A. Hunt (rancher and, at the time of the riot, a Port Commissioner) testified: "Q (By Mr. Krause) Where were you during the riot, Mr. Hunt? A I was down at the east end of Warehouse No. 1, where this pineapple was being or had been unloaded, some of it, there. * * * Q Go ahead and tell us what you saw and heard at that time. A I started walking on towards the office, meeting this bunch of men, and as they came toward me, why, some of them went on this side and some on the other. They paid no attention to me at all, apparently. Some of them had clubs and different things they were packing. Some of them I noticed reached down and grabbed something as they passed by, some stick or something. I don't know what it was. It looked like a stick. I heard some of them say, 'Now remember, fellows, no violence.' I also heard one or two say, 'Remember, don't touch anybody or damage any property of this port.' And then immediately I was through the gang."

ures which they had just taken,[2] but instructed them to remain outside the property. Thereupon, the picket line dispersed. But the streets of The Dalles were patrolled by gangs of men with a threatening attitude and belligerent manner, and the small community was thereby dominated. For something like a month, similar conditions prevailed as those above described, while attempts were being made to obtain a solution. On October 19, the picket line was restored when employees of the Union Pacific Railroad spotted cars on the dock in an attempt to move part of the cargo by rail. As a result of such measures, Pineapple was not able to transport any of this cargo until after October 26. Eventually, when some concessions were made by the Port so that the unions could claim they were not entirely defeated, the picket line was withdrawn and the remaining pineapple was shipped to California. A number of the individuals who had gone on the dock were arrested, indicted and convicted of the crime of riot in the Circuit Court of the State of Oregon by pleading guilty to an indictment (here introduced in evidence) which charged, in part, that each of them "did then and there unlawfully, wilfully, routously and riotously trespass upon inclosed premises not their own, or either of them, namely, the premises of the Port of The Dalles; and did then and there unlawfully, routously, riotously and feloniously make an assault upon Don Higham, Eugene Hoard, Elvy Davis, Clarence Rosales and Raymond Curto, by then and there unlawfully and feloniously striking and beating them with said cargo hooks, iron bars, clubs and sticks."

Both Pineapple and defendants have filed motions for new trial affecting one or more of these cases. The grounds are so broad that complete review must be had to determine to the satisfaction of the Court the fairness of the judgments.

■ At pretrial conferences the Court directed the presence of all individual defendants as well as official representatives of Local and International, in accordance with normal custom of this Court.

The rule of the District of Oregon is that, except when excused by the Court, the litigants themselves must attend pretrial conferences, conducted in open court, with the court reporters present. The purpose is two-fold: first, to speed and make more accurate the issues thus simplified; second, to require litigants to participate in the proceedings and convince them of the fairness and objectivity thereof. These aims have been given little prominence in the literature on pretrial conferences. The "conversation" or "shirtsleeves" proceedings in the chambers of the judge would be of no value in realization of these aims. All phases of the litigation are conducted in open court. This was the method of the common law judges and lawyers. Return to the methods of oral pleading at common law is thus attained. Proceedings out of court bind no one. No distinction is made in this Court between proceedings before trial and the trial. Here there is a record. The advantages are many. The first purpose of these orders is to do away with the delays of common law and code pleading, to define the issues, both ultimate and evidentiary, to eliminate false issues and to guarantee that the controverted questions are in good faith contested. The second purpose is to have the individual litigant actually in open court before the judge and his adversaries, where he hears the discussion of his conduct and claims and is in a position to correct factual errors.

■ Instead of the delays which were formerly necessary, legal and factual positions can be taken on the spot. The clients are in court and advice can be immediately obtained from them as to the facts. Admissions made in open court are judicial in

2. Earl Ayres (salesman for Sunset Motor Company) testified: "Q (By Mr. Krause) What did you hear Mr. Meehan say to the men? A He told them that they shouldn't have gone out on to the dock; that they were supposed to be peaceful pickets. Q What else did he say? A But he told them that they did a fine job. Q Anything else? A Well, he understood they were going to have a meeting that night and he wanted them to turn out for it."

nature and binding unless the Court permits modification where there is clear error. The greatest advantage is in public relations. Often modernly, litigation is handled by organizations and lawyers which they select, while the individual whose interests are at stake is given no opportunity to observe the alignment or disposition of the cause. The tendency to use the individual as a pawn of some organization demigod has been heretofore noted. Important objectives are accomplished, therefore, by the rules: first, the litigant is made a part of the procedure; second, the proceeding not only appears fairer, it is fairer.

A striking exemplification of such factors appeared in the instant case. As above noted, criminal proceedings had been brought against various individual defendants in the state courts, and there had been pictures taken at the time of the invasion of the dock. The attorneys for the individuals naturally felt hesitant about making such important admissions on their own authority. But fifty-two defendants in open court admitted presence on the dock during that time. Pineapple accepted these statements and did not introduce proof that other defendants were on the dock. The issues were clarified by these admissions, and the individual defendants recognized their responsibility as individuals and not as mere units of an aggregate, the union.

The pretrial order was drawn by the respective attorneys, based upon the admissions and the issues developed at the conference. This order, signed by the Court, states that it defines all issues and that the pleadings pass out of the case. No question can now be raised, therefore, as to the sufficiency of the complaint to state a cause of action, although a motion to dismiss was directed against it. However, in order that the position may be perfectly clear, the Court holds that the complaint states a cause of action against the unions under the Federal Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. It also states a cause of action against the unions and the individuals under the common law. Another question arose on the motion to quash service. This is also moot. The unions were properly served under the statute and the rule. The individuals were likewise properly served.

The pretrial orders in the three cases at bar were separately entered and contain certain agreed facts, contentions of the respective parties, issues of fact, issues of law, tabulation of exhibits and agreement that the cause be tried on the issues presented by each pretrial order alone. The causes were tried upon all issues involved at one time, since the states of fact were inextricably bound together. But separate verdicts and judgments were entered in each. In all of the proceedings, the attorneys for the defense cooperated as did the attorneys for plaintiffs. Indeed, with issues hotly contested and in an explosive emotional atmosphere, the lawyers carried on the trial in accordance with the highest ethical concepts of the profession. The trial was fair to all concerned, and the rights of the defendants, collectively and individually, were fully protected.

The motions for new trial present these problems against this background of a fair trial. Defendant unions contend that the verdict against them was inconsistent with a verdict in favor of individual members of the union, who were named also as defendants. On the other hand, plaintiff Pineapple asked for a new trial on the ground that the Court failed to instruct the jury that the liability of the individuals stood on the same basic principles as that of the unions.

█ In answer to the contention of the unions, it may be said that there is no requirement that verdicts be logically consistent. It is only necessary that the particular verdict be upheld by the evidence under the rules of law.

The pretrial order holds the question of whether the unions, either alone or in combination, were liable under the applicable statute upon the facts.

The Court charged the jury that plaintiff Pineapple, in order to show liability of a defendant union, must prove by a preponderance of the evidence (1) that the activity affected commerce, (2) that a labor organization was involved, (3) that one or both unions (a) induced or encouraged (b) the employees of an employer (c) to engage in

a concerted refusal in the course of their employment (d) to use, transport or otherwise handle any goods or to perform any services in connection with the cargo of plaintiff Pineapple (4) that one of the objects of the inducement or encouragement was to force an employer or other person to cease doing business with any other person, and (5) that plaintiff Pineapple was injured as a direct and proximate result of such act.[3]

There was sufficient evidence upon each phase to sustain a verdict in favor of Pineapple and against either or both unions.

(1) It was clear and was agreed in the pretrial order that the situation here involved "an industry or activity affecting commerce."

(2) It was apparent and agreed in the pretrial order that labor organizations were involved in the controversy.

█ (3) (a) The record tended to show that the failure of various concerns in Tacoma to unload the barge was accomplished by pressure brought upon the officials and members of various unions by International. This feature was not included in the charge to the jury and was not important except that the incident threw light upon the method of operation and the objectives sought. As noted above, when information was received of the prospective docking at The Dalles, Meehan attempted to persuade the officials of the municipality not to permit the use of the facilities by the barge. Again, the incident is not important except for the light it throws upon subsequent events because, as the Court charged, persuasion of an employer does not fall within the act.

It is shown without cavil that communications and brotherly compulsion were had with members and officials of the local teamsters union, members of which were employed by trucking firms operating in interstate commerce to and from The Dalles, with members and officers of the mechanics union whose members were employed by Goodat Crane Company, which owned a crane leased by Pineapple, to work at unloading the cargo with members and representatives of the Brotherhood, members of which were employed by the Union Pacific Railroad, an interstate rail carrier whose switching facilities ran into the Port and which could have been used in moving the pineapple. Finally, strong argument, appeals to class loyalty and implied threats were used by representatives of Local to persuade and induce the two teamster employees of Pineapple before they had arrived at the dock not to go there for the purpose of transporting the cargo.

█ It is true that a great deal of the persuasion and inducement was accompanied by threat, a tremendous show of potential force, and finally by actual violence. It is contended that violence is fact without juristic importance in an industrial dispute, since it must be dealt with by local authorities and has no relation to the problems of law. No form of inducement could be more effective than threats of death, enforced by brandishment of a cargo hook and kicking and beating, the picket line, ominous and threatening, the violent break-through of the cordon of police and the surge onto private property, the smashing of cameras of newspaper men and the patrolling of the streets in numbers with threatening demeanor. The instant statute gives legal significance to any method of persuasion or inducement.[4] The Court prevented any undue emphasis

---

3. So that there may be no misunderstanding, the Court's charge to the jury is set forth in its entirety in an appendix.

4. International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 701–702, 71 S.Ct. 954, 958, 95 L.Ed. 1299: "The words 'induce or encourage' are broad enough to include in them every form of influence and persuasion. There is no legislative history to justify an interpretation that Congress by those terms has limited its proscription of secondary boycotting to cases where the means of inducement or encouragement amount to a 'threat of reprisal or force or promise of benefit.' Such an interpretation would give more significance to the means used than to the end sought. If such were the case there would have been little need for § 8(b) (4) defining the proscribed objectives, because the use of 'restraint and coercion' for any purpose was prohibited in this whole field by § 8(b) (1) (A)."

upon this feature. But facts are facts and were here undeniable and for the more part undenied. Considering union tradition and feeling, the picket line itself was an inducement or persuasion to all employees of employers not to attempt to go on the dock to transport or handle the cargo.

■ (3) (b and c) The attempt was to have the employees of the various concerns which might have assisted in moving the cargo "to engage in a concerted refusal in the course of their employment" to handle the pineapple. Of course, as the Court pointed out to the jury, it was sufficient if the persuasion or inducement were made. It was not necessary that it be successful. There was evidence that the members of the Brotherhood, employed by the Union Pacific Railroad, concertedly did not attempt to switch cars for the pineapple. There was evidence that the teamsters, employed by truck lines, including the Portland-Pendleton Motor Transport Company, Consolidated Freightways and Oregon-California-Nevada Fast Freight, concertedly in each instance refused in the course of their employment to move the pineapple from the dock. Only one employee of Goodat Crane Company was engaged as an operator of the crane on the dock. He quit the job and refused to handle the cargo as a result. No other operator could be obtained from among the employees of the crane company to handle the crane or the cargo. This was evidence of a concerted refusal upon the part of the employees of Goodat Crane Company in the course of their employment. Several truck drivers, who were employees of Pineapple,

left the dock and never returned after some of them had expressly agreed not to transport any of the cargo because of duress, of assaults, and of the threats above mentioned. The circumstance that the number of these truck drivers was not great was not significant if they took concerted action in the course of their employment.[5] In these many instances, the inducement or persuasion was highly successful, but the statute penalizes the inducement or persuasion whether the end is attained or the attempt to induce and persuade is futile.

(3) (d) The evidence was conclusive that the inducement or persuasion was directed toward the concerted refusal "to transport or otherwise handle" a specific cargo of pineapple. The record is replete with evidence that this was a direct boycott for the sole reason that the cargo originated in Hawaii.[6] There was constant reiteration by the unions, their representatives and members, of the phrase "hot cargo" or "hot pineapple." The handling or unloading and the transportation of this cargo were the point of the attack. So far as the record shows, there never was an attempt to interfere with the Port of The Dalles or the employees thereof while engaged in loading or unloading other products or freight except this. Every incident of this controversy hinged upon the handling and transporting of this cargo alone.

■ (4) The record also showed that it was one of the objects of the inducement and encouragement to force or require an employer to cease doing business with "any other person."[7]

5. National Labor Relations Board v. International Rice Milling Co., Inc., 341 U. S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, does not hold that the number of employees who act or refuse to act is controlling, but whether they act in concert or merely as individuals. In International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 2 Cir., 181 F.2d 34, 37, the Court of Appeals, speaking through Judge Learned Hand, held that, when two carpenters in concert left the job on inducement of a union agent, there was sufficient concerted action within the purview of § 8(b) (4) (A) of the Act, 29 U.S.C.A. § 158(b) (4) (A).

6. There was a specious claim that there were other reasons. The Court submitted to the jury the issue of whether one of the purposes of the picketting was that proscribed by the statute. The statement in the text correctly indicates the content of the record. But, of course, this was not directly an issue in the case.

7. § 8(b) (4) (A), in substance, prohibits strikes or the inducement of work stoppages to compel one employer or person to cease handling the products of, or doing business with, another employer or person. Hence, it is the object of the union action that is proscribed, regardless of the means adopted. The view of the

The object of the longshoremen was to isolate the cargo and prevent it from being handled by anyone and particularly transported. Therefore, it was one of the objects of the action to force or require the other persons and corporations to cease dealing with Pineapple and to force Pineapple to cease dealing with others. Not only was this the object of the compulsion, but it was effective. But the statute only requires that this be one of the objects. The evidence shows clearly the longshoremen aimed directly at this object. They did compel Pineapple to cease dealing with the railroad, the Port of The Dalles, the trucking lines, and the crane company. These measures also prevented the railroad and the trucking lines from dealing further with Pineapple after orders to move the cargo had been sent to them. Likewise, the Goodat Crane Company was required to cease renting its crane to Pineapple. It is true Pineapple bought the crane, but this circumstance did not prevent the cessation of dealing as an object of the unions; it also caused the cutting off of the leasing operations. Actually, complete stoppage of all business relations between all these groups for a long period of time was accomplished.

(5) The jury found Pineapple was injured as a direct and proximate result of these acts, and the evidence gave complete support to the finding.

■ Thus it is patent that a cause of action under the Labor Management Act was stated as to each union, and the record shows that, as to each, there was substantial evidence to support a verdict. There is no inconsistency in the verdicts as to the unions and the individuals, who were freed from liability thereby.

■ It is true, there is a well established principle that a defendant cannot be held on the theory of respondeat superior for an act of an agent, if it be found as a fact that the agent did not do the act upon which it is attempted to impose liability. But this doctrine has no application here. Here the charge involving the individuals is a conspiracy to effect unlawful acts. The individuals may have done or assisted in doing the acts, the unions may have been found to have done the acts and thereby have incurred responsibility; but the mere fact that certain individuals who may have done certain acts were not found to have entered into a conspiracy with the union to do them is of no consequence. The liability would have been on entirely different grounds. Besides, as hereinafter noted, the acts of individuals for which a union might be responsible by either express authorization or express ratification would not bind other individuals. The unions could be held under the terms of the Federal Labor Management Act. A cause of action could not be stated or maintained against the individual defendants under that act, which applied only to organizations.[8] Therefore, as to them, the Court instructed the jury under the common law which the

United States Supreme Court is that it is not necessary that the proscribed object be the only object or even the principal object of the union's activities. National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed. 1277; National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284.

"It is not a defense that other motives may have entered into the action of the respondent [unions]." National Labor Relations Board v. Wine, Liquor & Distillery Workers Union, 2 Cir., 178 F.2d 584, 586, 16 A.L.R.2d 762.

See also 31 Oregon Law Review 237; 2 Labor Law Journal 263, 680.

**8.** "It shall be an unfair labor practice for a labor organization or its agents * * *." 29 U.S.C.A. § 158(b). The provisions of this section limiting the right to strike are not directed against the individual worker but against concerted action of labor organizations and their agents. United States v. International Union, United Mine Workers of America, D.C.D.C., 89 F.Supp. 187; 64 Harvard Law Review 797, 808.

"* * * sec. 8(b) is not directed at the conduct of individual employees, but at the conduct of labor unions themselves." 31 Oregon Law Review 235.

"Activity on the part of individual employees—however unlawful or coercive it may be—is not an unfair labor practice. Only unions and their agents are subject to these provisions of the act." 2 Labor Law Journal 733.

Court felt was applicable.[9]  In so doing, the Court placed a somewhat greater burden upon Pineapple as to these individuals. Since there was a greater degree of proof required as to the individuals than as to the unions, there can be no inconsistency in the diverse findings.

Before dealing with defenses, it is well at this point to dispose of plaintiff Pineapple's motion for new trial upon the ground that the individual defendants could have been held upon the same ground and the same evidence as were the unions. Pineapple here repeats the same error as was made by the unions in contending that the verdicts were inconsistent.

It is true that the Court may not have accurately stated the elements of liability at common law as to the individuals. But no exceptions were taken to the instructions upon this ground. The subject is highly complicated and the question of whether the state law or a common law adopted by the federal enactments applies is extremely nebulous. Certainly, the ground chosen by Pineapple for objection and exception cannot be maintained. The jury found against Pineapple on a fair statement of the common law. This motion for new trial is therefore denied.

Since we have now an exact outline of the cause of action which the Court found in the complaint and the issues set up in the pretrial order as against the unions, certain of the defensive issues should now be considered to determine whether or not a new trial should be granted. Certain of these were not specified as grounds for new trial, but the record as a whole should be considered in disposition of these motions.

The Court did give further instructions upon the only point upon which there could be any requirement of proof by Pineapple. The Court positively required the jury to find affirmatively that the persons were acting within the scope of their authority before the unions or either of them could be held responsible for the acts of these "agents" and "representatives."[10]  This, of course, is the test used in the instructions on the second trial of the United Brotherhood case.

Although the instruction thus conforms to the test of the Brotherhood case, there was no technical necessity that it do so. There was a fair treatment of the situation in the instructions. If anything, these were more favorable to defendants, both individual and union, than the law required. It must again be noted this was a civil and not a criminal case, and the statute sets up standards foreign to those used in the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq.

The next point made by the unions is that the jury returned a verdict in the amount which Pineapple indicated was the exact amount of its monetary damage, and thus, as the unions claim, gave no consideration to minimizing damages. But the Court would have upheld a verdict in a much greater sum within the limits of the prayer of the complaint, if it had not been for an express disclaimer by Pineapple during the trial. The jury returned a lesser sum probably because they believed Pineapple would be satisfied to accept that amount. In view of the actions for which the unions were found liable, the jury unquestionably felt that Pineapple was not required to accept damages scaled down for the benefit of the unions, the aggressors. The Court agrees.

The point as to inconsistency is highlighted by another of the grounds for new trial. It is said that the Court fixed responsibility upon defendant unions by stating that certain individuals were agents, officers or representatives of one or the other of these defendants. But the judge is not an automaton.

The evidence showed without cavil that Louis Goldblatt was an officer and Matt Meehan, William Gettings, Henry Schmidt and Howard Bodine were agents and representatives of International and that Robert Baker and Wilfred Mackey were officers and Toby Christiansen and Matt Meehan were agents and representatives of Lo-

---

9.  See Appendix for complete charge relating to liability of the individuals.

10.  See Appendix.

cal. There was no evidence to the contrary. There was no attempt to prove the opposite.

In support of this claim of the unions, there is cited United Brotherhood of Carpenters and Joiners v. United States, 330 U. S. 395, 67 S.Ct. 775, 91 L.Ed. 973. The writer tried that case upon the return thereof to the District Court and gave instructions therein in accordance with the opinion cited. A conviction followed, and no appeal was taken. That case was a criminal prosecution to which it was held Section 6 of the Norris-La Guardia Act applied. This is a civil suit for damages under the Taft-Hartley Act, which sets up its own tests of responsibility.[11]

The Court will now consider some of the other inherent defenses so that the attitude of defendant unions may be viewed in the light of the record as a whole. There was a claim that Local was attempting to get the work of unloading for its own members. This attempt to build up a controversy with the Port of The Dalles over the hours and wages of the employees handling this cargo highlights a very significant factor in this case in appraising the verdict. The jury considered this claim under the instructions and must have decided that one of the objects was that proscribed by the statute. Under the law, the attempt to get work for its own members would avail nothing in avoiding responsibility if the other elements which the statute condemns were present.[12] Besides, it will be noted, the very aim which the unions say now motivated them is also proscribed.[13] The contention was specious and not in accord with the facts.

It stands out with naked clarity that International moved to boycott this cargo for the sole purpose of exerting pressure upon the public in Hawaii by isolating the islands from the continent. The record not only establishes the boycott and its purpose, but negatives all other reasonable postulates.

These unions had no quarrel with the tug "Ona" or the barge YFN624, which had been rented by Pineapple from the navy. By no possibility could this barge be considered as a portion of the plant of Pineapple with an ambulatory situs. Neither the Hawaiian Local nor the Portland Local 8 had any controversy with Pineapple or Isleways. Isleways had no controversy with its own employees, either here or in Hawaii. Concededly, the Hawaiian Local had no relations with Isleways. Nor did Local. It was not contended that any local affiliated with International had any direct relationship with Pineapple or Isleways. The dock in Hawaii from whence the barge sailed was picketed. Pineapple is not shown to have ever employed a member of Local or, for that matter, a member of any local affiliated with International. There was no attempt to organize the employees of Pineapple. Pineapple had no difficulty with its own employees. Local had no quarrel with the Port of The Dalles or its employees until the officers thereof permitted the barge to be tied there and an attempt made to unload.

Then it is contended in extenuation that there was picketing in the islands of a Hawaiian local against some alleged subsidiary of Castle and Cook, with which latter Pineapple is claimed to have been affiliated by interlocking directorate and financial inter-relation. No administrative board or court has held such feature constitutes a valid ground for picketing. There is shown no community of interest among the corporations on the one hand or the locals on the other. Harry Bridges, President of International, testified that, under the agreement of the latter with certain shipowners, collusive picket lines, jurisdictional picket lines, hot cargo picket lines and demonstration picket lines were, as he expressed it, "illegal." That agreement was, of course, not binding upon either Pineapple or defendants, since there was no claim or offer to prove that Pineapple, Isleways, or even Castle and Cook were signatories or in anywise connected therewith. But this expression of opinion

11. 29 U.S.C.A. § 185(b), (e).

12. See Note 4.

13. 29 U.S.C.A. § 158(b) (4) (D) expressly outlaws jurisdictional strikes.

by one most intimately concerned is extremely persuasive since the law, common and statutory, actually does proscribe such activities. Inasmuch as there was no proof to show either that the Hawaiian local or Local 8 had any connection with either the barge or the tug or had any connection with Pineapple or Isleways or with Castle and Cook or indeed had any connection with the cargo, the picket line was neither legitimate nor bona fide under the terms of the agreement made by International. Likewise, it was proscribed by law.[14]

There was no offer of any proof as to whether there was a strike or even picketing. Since no such proof was offered, there was no legal justification for a member of that local to attempt to boycott a cargo of Pineapple, who was not his employer and with which neither he nor his union had any dispute. The Court rejected an offer to prove the claimed relation between Castle and Cook and Pineapple, for, even if the claim be conceded, it gave neither the member of the Hawaiian local nor the unions here involved standing.[15]

14. Bridges attempted to justify the instant situation on the ground that the Hawaiian Local was striking over wages and that the barge was a "struck ship," but the evidence shows this latter statement was not true. He specifically admits that this ground was one of the motivating factors of the picket line. Since the evidence then showed this, and since such object was illegal, whatever may have been some other motive, his statement supports the verdict.

15. A discussion of the "Ally" doctrine is helpful in disposing of this contention. During the course of congressional debate on the act, Senator Taft stated, "This provision [§ 8'(b) (4) (A)] makes it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees." 93 Congressional Record 4198 (1947). Based on this statement of legislative intent, some cases have tried to limit § 8(b) (4) (A) by holding that a boycott may legally be directed against a secondary employer if he is not a neutral party to the dispute between the primary employer and the union. Such a limitation is not suggested by the language of the act but, say the theorists, "was read into the statute in order to avoid going beyond the purpose of protecting innocent third party employers in a labor dispute." 64 Harvard Law Review 802; 31 Oregon Law Review 235.

The words of the statute, "any employer" and "any other person", seem so plain and unambiguous that under the plain-meaning rule a resort to legislative intent is unwarranted and the pitfalls of delineating neutrality should be by-passed: Since all those who regularly do business with an employer are interested financially in the outcome of his labor disputes, it is extremely difficult to determine how disinterested an employer need be to re-

ceive the protection of the act under the above rationale.

The Supreme Court has not yet ruled on this doctrine nor attempted delineation. National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 669, 71 S.Ct. 961, 95 L.Ed. 1277, by way of dictum, mentions the term "neutral" but makes no attempt to define it.

The cases which have considered this doctrine have used it quite sparingly. Thus far, the National Labor Relations Board has denied protection on the ground of non-neutrality only in cases like the Irwin-Lyons case, 87 N.L.R.B., No. 9, where the primary and secondary enterprises were under the same ownership and control and engaged in integrated operations; i. e. substantially the same enterprise. See 64 Harvard Law Review 802, 2 Labor Law Journal 268. In practically all the cases in which non-neutrality has been urged, the National Labor Relations Board has found neutrality. The business relationship between a contractor and subcontractor in the construction industry will not cause non-neutrality. Gould and Preisner, 82 N.L.R.B. 1195. The Supreme Court apparently follows this view. See National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1277. Likewise, the National Labor Relations Board reached the same result concerning relationships between a contractor and his subcontractors in other industries, Climax Machinery Co., 86 N.L.R.B. 1243, between a liquor distiller and his wholesale distributors, Schenley Distillers Corp., 78 N.L.R.B. 504, and between a manufacturer of prefabricated houses and the builder who purchases and erects them for sale, Wadsworth Building Co., 81 N.L. R.B. 802.

The leading district court opinion finding non-neutrality is that of the Southern

International, according to its own reiterated position, had no authority over the Hawaiian local, and the Portland local, which is approximately twenty-five hundred miles away, had no ground to boycott a product[16] with which it had no connection by employment or handling against an employer with whom none had had any relation. No decided controversy, whether by administrative board or court, holds there is any basis for protected concerted action upon the facts claimed here.

■ It is axiomatic that in American society labor unions are highly favored. The statutes firmly found the right to bargain collectively for wages, hours and conditions of employment. The Congress and the Executive and the Courts recognize the strike as a legitimate device to publicize grievances and to exert pressure. The key purpose of recognition of this outstanding position accorded to labor is to prevent obstruction of interstate and foreign commerce. All of the federal labor legislation requires in positive and explicit terms that anything which has a tendency to prevent the free flow of goods between states and territories is to be eliminated. If a labor group is able to boycott goods and prevent the further transportation thereof, simply because these originated in Hawaii, important effects upon the public might be accomplished. The proscription might accomplish the results of a "general strike" so far as Hawaii is concerned. This might well be likened to the outlawry of an individual in middle-age England. Or, more appropriately, to the ban imposed upon a kingdom because of the recalcitrance of a ruler. In either the people suffer. If this attempt were successful, the foreign policy of the United States could be seriously affected by the union, in thus isolating the islands of our sea frontier.

The concern is not primarily the interest of either the unions, longshoremen or in-

---

District of New York, by Judge Rifkind, in Douds v. Metropolitan Federation of Architects, D.C., 75 F.Supp. 672, which held that, when a struck manufacturer subcontracts his work to his own subsidiary and sends his own foremen to supervise the subcontractor's employees, picketing the subcontractor may not be illegal since the parties may not be "doing business" with each other within the meaning of the act. See 50 Michigan Law Review 318. The Court of Appeals for the Second Circuit apparently is not too fond of this rationale, for it has narrowed Judge Rifkind's test down to identity of ownership and management and in most cases found neutrality. See National Labor Relations Board v. Wine, Liquor & Distillery Workers Union, 2 Cir., 178 F. 2d 584, 16 A.L.R.2d 762; 2 Labor Law Journal 737.

In discussing this issue, Judge Learned Hand, in International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 2 Cir., 181 F.2d 34, 37, said: "In short, is a secondary boycott limited to pressure upon third parties who are not engaged in the same venture with the unyielding employer? We can see no basis for such a distinction. The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands. We cannot see why it should make any difference that the third person is engaged in a common venture with the employer, or whether he is dealing with him independently. The phrase, 'doing business,' would ordinarily cover doing any business which the third party is free to discontinue, regardless of whether he is merely supplying materials to the employer, or has subcontracted with him to perform part of a work which the third party has himself contracted to do."

Hence there is considerable doubt that the "ally doctrine" imposes a real limitation on § 8(b) (4) (A). The test seems to boil down to—are the two enterprises the same? If they are, then the terms of the statute "doing business with any other person" are not met. In the instant case, Castle and Cook, Isleways, and Hawaiian Pineapple Company are different enterprises and the terms of the statute are fulfilled.

16. "Product boycotts are within the ban of 8(b), (4) (A)." Judge Hulbert in Douds v. Confectionery and Tobacco Jobbers Employees' Union Local 1175, etc., D.C., 85 F.Supp. 191, 196. See also 2 Labor Law Journal 269; Wadsworth Building Company, Inc., et al., 81 N.L.R.B. 802.

dustry, the private parties who were before the Court. There is a paramount unity of interest which over-rides all other considerations. It was to the interest of the longshoremen as well as the industry and each individual citizen of the general public that commerce between Hawaii and the mainland should be uninterrupted by the selfish interests or demands of either the industry or the unions.

The public interest is here paramount and not the selfish interest of the economic giants in the conflict. Freedom of ocean transportation cannot be denied to anyone with safety to the nation. The specious plea that some laborer or group of laborers in Hawaii or Maine suffers discrimination cannot halt commerce between Oregon and California. The use of the weapons provided for economic bargaining cannot be made with impunity against the public itself. This boycott was against the public interest, as the jury obviously found.

Interference with the transportation of goods between a territory and the states or from one state to another is a direct burden upon and obstruction of interstate commerce. If such an obstruction occurs, it is illegal.[17] If it occurs in the manner proscribed by the statute, liability is created. The Court carefully laid down the law as enacted by Congress.[18] The considerations which have just above been adverted to show that the result was morally sound and in accordance with the public interest as well as technically exact.

There is one additional point in the motions of defendants for new trial in the separate cases for assault and battery. It is said that the wide disparity between the proof of special damages and the compensatory and punitive damages allowed indicates passion and prejudice on the part of the jury in each of these cases. Suffice it to say, the damages allowed are not, in the opinion of the Court, excessive. Where the evidence shows, as here, that two truckers were set upon by approximately fifty men, jerked out of a truck, threatened with death by means of a cargo hook, and so kicked and beaten that they were injured, this Court would, in judicial calm, sustain verdicts much higher, whether compensatory or punitive. The union card does not entitle any defendant to immunity for the results of acts of physical violence. The jury spoke for the public here. The result is reasonable and must be sustained.

The motions for new trial by plaintiff Pineapple and defendants, respectively, are denied.

Appropriate orders may be prepared.

## APPENDIX

### Instructions of The Court

The Court: Ladies and Gentlemen of the Jury, we have now arrived at the final act in these three cases which are submitted to you for trial. I know that you have paid very careful attention to the evidence throughout this rather long trial and that you have approached the thing in an entirely fair and impartial manner. It is with entire confidence that the Court submits to you for determination the questions of fact in this case.

You have heard the arguments of counsel in the cases on both sides. As I said before, counsel are not witnesses. They are simply advocates. They have a right, and it is their duty, to urge the cause of their clients and to suggest to you the things which they believe can be found from the evidence. You may, of course, accept such inferences and deductions as they suggest to you, but you are not bound to. You are the sole and exclusive judges of the facts in this case and of the credibility of each and all of the witnesses. This is a function with which the Judge does not attempt to interfere. The responsibility for the decision of the facts is yours.

It is true that a United States Judge may comment upon the evidence and give you his viewpoint as to the credibility of the witnesses. However, in this case the Judge does not intend to exercise that function.

---

17. Waterfront Employees of Portland, et al., v. C. I. O., 1 C.C.H.Lab.Cas. 386; M & M Wood Working Co. v. Plywood & Veneer Workers Local, etc., 1 C.C.H. Lab.Cas. 389.

18. See Appendix.

This is a question of fact and should be decided by you as a question of fact. If any of you should have any idea as to how I should decide the facts in any of these three cases, I charge you explicitly that you need not pay any attention to what my attitude might be, because it is my intention to commit the facts to you solely and exclusively for decision.

It is my responsibility to lay down for you the rules of law, and if I tell you a certain thing is a rule of law then that is binding upon you, because there are other tribunals which are set up to take care of any mistakes I happen to make. I don't think I will make any, but there are courts for correction of my mistakes on the law, so you don't need to worry about that. Even if you don't agree with the law that I lay down it is your duty to follow it.

You must, of course, reach your verdict on the basis of the evidence that has been produced before you and in the light of the law as given to you by the Judge. You are sworn under oath to try these cases upon the law and the evidence. This excludes any consideration of sympathy, prejudice, passion or bias that you may have against or for any litigant, either plaintiff or defendant. Therefore, you will not permit any such considerations for or against any litigant to enter your deliberations at all, nor will you deal on the basis of speculation or chance, but solely be guided by the evidence which has been produced in this courtroom under the rules of law as the Court shall give them to you.

There will be presented for your consideration three different civil actions for damages. The first of these is Civil 5183, Hawaiian Pineapple Company, Plaintiff, against International Longshoremen's & Warehousemen's Union and International Longshoremen's & Warehousemen's Union, Local 8, and various individuals also named as defendants therein. This action is brought by the Hawaiian Pineapple Company, Ltd., for the purpose of recovering damages alleged to have been caused to its business and property by the alleged acts of the union or unions and of the individual defendants.

Now, as a matter of timesaving throughout these instructions I shall use the single word "International" to designate the general union in which the various locals are affiliated and which has its headquarters in San Francisco. Throughout the instructions, likewise, I shall designate the Portland local union affiliated with the International as Local 8.

The second action which will be submitted to you for determination is Civil 5104, which was brought by Raymond Curto as Plaintiff against Matt Meehan and some forty other individuals named as defendants. This action is to recover damages for injuries claimed to have been sustained by Curto by reason of alleged activities of the defendants in willfully beating and injuring him at The Dalles, Oregon, and disabling him from carrying on his occupation.

The third action is Civil No. 5105, and is brought by Clarence Rosales as plaintiff against Matt Meehan and forty other named individuals as defendants. This action is to recover damages for injuries claimed to have been sustained by Plaintiff Rosales by reason of the alleged activities of defendants in willfully beating and injuring him at The Dalles, Oregon, and disabling him from carrying on his occupation.

Although all of the evidence is for your consideration in each of these three cases, the cases themselves are separate, depending for their solution upon separate legal principles. I will instruct you separately as to each of the cases, although I will join the two personal injury cases for convenience. You will be asked to return a separate verdict in each one of the three cases.

Now, there are some other general ideas which I wish to give you with regard to each of the three cases. In each of the three cases the particular plaintiff has the burden of convincing you by a fair preponderance of the evidence that he has proved his case as to each material contention. If you are so convinced, you may return a verdict in favor of each plaintiff who so convinces you and against those defendants only whom you find liable according to the instructions. If, in any case, a plaintiff fails to prove any material contention, then

that case must fail as against the defendant or defendants involved in the contention.

A fair preponderance of the evidence is not determined by counting the number of witnesses on each side, but by weighing in your minds the strength of the evidence produced on either side in the light of the credibility you give the witnesses. In determining whether a preponderance exists, you must consider all the circumstances as the nature of the case permits, bringing to bear upon them the experiences and observations of life and weighing them with prudence and care.

Now, there is one factor that runs throughout the cases, and I shall take that up because that is a question of admissions. With respect to all three cases also, the indictment and sentence, Exhibit 26, was admitted in relation to the individual defendants who pleaded therein, and is in the nature of a personal admission. It is not evidence against any other person or union in the case. However, if you find the acts were done by an individual defendant, you may consider such acts in connection with the other defendants, subject to the other instructions in the case.

Now, also, there runs a question of admissions of agents throughout all these cases. Admissions of agents, made while engaged in the business of their principal and within the scope of their authority, with reference to matters in which they are properly engaged for their principal, is evidence against their principal. However, all oral admissions reported by another witness in court should be viewed with care. The person speaking may not have clearly expressed his meaning or the witness may have misunderstood him.

The Court will now proceed to outline the case of Hawaiian Pineapple Company, Ltd., v. International Longshoremen's & Warehousemen's Union and International Longshoremen's & Warehousemen's Union, Local No. 8.

The primary liability of either the International or Local 8 depends upon the existence of a duty owed by the International or Local 8, or either or both of them, to the plaintiff. The duty of each of these unions to the plaintiff is established by cer-

tain laws passed by the Congress of the United States. Trade unionism is favored in the United States. Public opinion is in its favor, and so far as these union organizations are concerned any person has a right to join and go along with them. The question in this case arises upon the question of whether there has been a lawful endeavor on the part of the unions.

The primary purpose of the laws which relate to these matters is to maintain the full flow of commerce, to proscribe practices which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce and to prevent action by employers or employees which has the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce, while at the same time fully protecting the rights of employees to self-organization to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activity for the purpose of collective bargaining or other mutual aid or protection, and also to protect the right of the employee to refrain from any or all such activity.

The law gives a right of recovery against a labor union, which represents employees in an industry affecting commerce, to anyone who has been injured in his business or property thereby under certain circumstances and limitations. This right is given where such a labor organization in such an industry induces or encourages the employees of any employer to engage in a concerted refusal in the course of their employment to transport or otherwise handle any goods, articles or commodities or to perform any services in connection therewith. These acts are actionable only where one of the objects of the incitement or encouragement is to force or require any person to cease doing business with any other person.

The words "industry affecting commerce," which the Court has used above, mean any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or

obstruct commerce or the free flow of commerce.

The word "commerce" includes trade, traffic, commerce or transportation among the several states or between any territory and any state, and especially between the Territory of Hawaii and the States of Oregon, Washington and California.

In this connection, the definition of "employer" for the purpose of these instructions includes neither the Port of The Dalles nor the Union Pacific Railroad. The definition of "person" does not include the Port of The Dalles.

The term "employee" includes any employee, and shall not be limited to the employees of a particular employer.

The Hawaiian Pineapple Company, Ltd., the Portland-Pendleton Motor Transport Company, Consolidated Freightways, Oregon-California-Nevada Fast Freight, and the Goodat Crane Company are each employers as the word is used in the law and in these instructions. The Hawaiian Pineapple Company, the Portland-Pendleton Motor Transport Company, Consolidated Freightways, Oregon-California-Nevada Fast Freight, Goodat Crane Company and the Union Pacific Railroad Company are all and each a person as that term is used in the law and in these instructions.

The plaintiff Hawaiian Pineapple Company, since we are speaking of that case, in order to show liability upon the part of any defendant labor union, must prove by a preponderance of the evidence:

First, that the activity then being carried on affected commerce;

Second, that a labor organization was involved;

Third, that one or both of the labor organizations named as defendants here induced or encouraged the employees of an employer to engage in a concerted refusal in the course of their employment to use, transport or otherwise handle any goods, articles, materials or commodities, or to perform any services in connection with the cargo herein involved;

Fourth, that one of the objects of such inducement or encouragement, if there was any, was to force or require some employer or some other person to cease doing business with any other person;

Fifth, that the plaintiff was injured in business or property as a direct and proximate result of such acts.

Now we shall turn to find what are the claims of plaintiff, the Hawaiian Pineapple Company, in order that we shall find what the basis of the contention is.

Plaintiff in the Hawaiian Pineapple case claims that, having no labor trouble with its own employees, it loaded a barge with pineapple in Hawaii and towed it toward the United States; that the barge eventually went to The Dalles; that the plaintiff, Hawaiian Pineapple Company, Ltd., made arrangements for the handling and transportation of the cargo of pineapple with a crane company and with an interstate railroad company and interstate trucking companies in commerce. Plaintiff claims that the International, acting through its officers and agents and Local 8, and the Defendant Local 8, acting through its officers and agents, combined to prevent the unloading and transportation of the cargo in interstate commerce, and that the unions and each of them induced and encouraged employees of various employers to engage in a concerted refusal to transport, handle or work on or perform any services in connection with the cargo of pineapple, with an object of forcing plaintiff, Hawaiian Pineapple Company, to cease doing business with certain employers and certain other persons and of forcing and requiring certain employers to cease doing business or dealing with the Plaintiff Hawaiian Pineapple Company. That the defendant unions, the International and Local 8, accomplished said inducement with those objects by: Calling on the employers to persuade the employees not to handle or to haul the cargo of pineapple; calling on officials and representatives of labor unions, representing employees of the interstate trucking concerns and of the crane company, to engage in a concerted refusal to handle the goods; maintaining a picket line at the Port of The Dalles; by a forcible and violent overrunning of the terminal of the Port of The Dalles and staging a riot and causing damage to employees and property

of the Hawaiian Pineapple Company; after the riot patrolling the streets of The Dalles on September 29th; resuming picketing on October 20th to October 27th; and continuing inducement and encouragement of employes of plaintiff and other employees after October 27th.

Plaintiff claims that as a direct and proximate result of these actions the plaintiff, Hawaiian Pineapple Company, Ltd., was damaged in business and property.

Now that is one side of the case. That is the Hawaiian Pineapple Company's side. The defendant unions and the individual defendants deny all these claims and allegations of the plaintiff above set out, and the defendants contend no conspiracy of any kind was entered into or combination by or between any of the defendants here for such purposes or for any purpose.

That the Hawaiian Pineapple Company and Isleways are wholly owned subsidiaries and alter egos of Castle & Cook, Ltd., Theodore Davies, Alexander-Baldwin and Matson Navigation Company and, as such, any strike referred to in said cause of action was a primary strike and not violative of any section of the Taft-Hartley Act or of any general or common law of the United States.

That any acts done and performed by said defendants were done and performed for the purpose of achieving legitimate ends of collective bargaining and the legitimate ends and purposes of trade unionism, namely, the prevention of the breaking down of wages and working conditions of the membership of Defendant Local 8.

That the Defendant Matt Meehan was at no time the agent or representative of the Defendant International in and about the matters as set forth in plaintiff's contentions.

That neither the Defendant Local 8 nor any of said individually named defendants were the officers, agents or representatives of said International in relation to any of the matters set forth in the plaintiff's contentions.

That each and all of the defendants deny that they either singly or collectively or in concert with each other did or performed any of the acts or things set forth in plaintiff's contentions.

That the Port of The Dalles is not "an employer" or "other person."

Defendants contend plaintiff could have purchased ample pineapple from other sources without money loss and thereby minimized damages.

Defendants contend that plaintiff could have refrained and refused to buy large quantities of fresh fruit in 1949 under its contracts to purchase fresh fruit from growers thereof without money loss and thereby minimize their damages.

Now, that sets up the contentions of the parties, and the Court will now state to you the conditions of recovery. You will remember that the Plaintiff Hawaiian Pineapple Company must prove its case by a preponderance of the evidence in order to recover and must prove all of the necessary contentions and allegations.

If the Plaintiff Hawaiian Pineapple Company, Ltd., has established by a preponderance of the evidence that the International, by and through its officers and agents, and Local 8, and Local 8 itself, through its officers, agents and members, or either the International or Local 8, induced or encouraged the employees of Plaintiff Hawaiian Pineapple Company, Ltd., to engage in a concerted refusal in the course of their employment to transport, handle or work on the cargo of pineapple in commerce, or to perform any services in connection therewith at The Dalles, Oregon, with the object of forcing or requiring Plaintiff Hawaiian Pineapple Company to cease doing business with the Union Pacific Railroad, one of the various trucking companies whose names I gave you a few minutes ago, the Goodat Crane Company, or any of them, or with its customers in the State of California, to whom the cargo was to be shipped, or any of them, and it is further established that as a direct and proximate result thereof plaintiff sustained damage to its business and property, plaintiff would be entitled to recover as against the defendant union or defendant unions doing the acts with the intent described.

Similarly, if plaintiff has established by a preponderance of the evidence that the International, by and through its officers and agents and Local 8, and Local 8 itself, through its officers, agents and members, or either the International or Local 8 induced or encouraged the employees of either the Goodat Crane Company, the Portland-Pendleton Motor Transport Company, Consolidated Freightways, Oregon-California-Nevada Fast Freight, or any other trucking lines doing interstate business from The Dalles, Oregon, to engage in a concerted refusal in the course of their employment to refuse to transport, handle, work on or perform any services in connection with plaintiff's cargo or with the object of forcing or requiring either Goodat Crane Service or any of the trucking lines, or both, to cease doing business with the plaintiff, and you further find that as a direct and proximate result thereof plaintiff sustained damage to its business and property, plaintiff would be entitled to recover.

Now, you must remember that in connection with the Goodat Crane Company on September 27th, 1949,—that is the day before the riot—Hawaiian Pineapple Company purchased the crane from the Goodat Crane Company, and therefore any inducement or encouragement of the employees of Goodat Crane Company must have occurred prior to the transfer of the crane, and with the intent above described, to fall within this instruction.

If you find that the employees of an employer did not by concerted action in the course of their employment refuse to transport commodities or perform services, but by a preponderance of the evidence you find that any defendant union is proved to have induced or encouraged them to do so with the intent above outlined, you still might find against that defendant or defendants on that issue.

In other words, it is not the actual taking of concerted action in the course of their employment by the employees of any employer, but it is the encouragement and inducement with the proscribed intent which the legislation of the Congress denounces.

You may consider whether or not the conversations which were held by certain individuals of the longshoremen with the truck drivers employed by the Hawaiian Pineapple Company were for the purpose of inducing or encouraging said employees of the Plaintiff Hawaiian Pineapple Company or any employee of any other employer to take concerted action in the course of their employment to refuse to perform any services as to the pineapple. You may consider that also to determine whether it was an object of any inducement or encouragement which you may find to force any person to cease dealing with the Hawaiian Pineapple Company. If so, you will in connection with the other instructions which I have given you determine whether that action was illegal or actionable. And that would be true whether such individuals advised the truck drivers of the fact either that the pineapple was "hot," as the phrase is understood in this proceeding, or that the Port of The Dalles was threatening the working conditions and wages of the Portland longshoremen, provided, of course, that you find the acts were done as I have set forth in the previous instructions and that the purpose was as outlined.

The inducement or encouragement, as mentioned in these instructions before, need not be by conversation or pressure upon the particular employees involved, since it may be accomplished by any effective means, such as the persuasion of the officers and agents of the union to which such employees belong, or by threats of reprisal, however communicated, or by violence against other persons or against the employees of another employer; in other words, any means which would accomplish the inducement or encouragement. And in that connection you may take into consideration the testimony and other evidence with regard to conversations held by certain persons with the officers and agents of other unions, such as the Teamsters' Union, or the other unions outside of the unions in suit, who had something to say to the employees of a particular employer. You may consider all the evidence in that regard to see whether or not inducement and encouragement was extended.

The inducement or encouragement must be exercised as to the employees of a par-

ticular employer to take concerted action in the course of their employment in the manner above described, but one of the objects of such inducement or encouragement, if offered to all the members of the general union or class of employees, must be to cause the interruption of normal business relationships between two separate employers before there can be any liability on either of the defendant unions. Further pressure brought directly upon an employer alone, without the purpose of inducing the employees of the particular employer to take concerted action in the course of their employment, would not establish any basis for liability.

One of the objects of the inducement or encouragement must be to force a particular person to cease dealing with another person. Therefore, if you find that the persons in question had never dealt with each other, the conditions for recovery would not be fulfilled, because the law requires that the object be to force a particular person to cease dealing with another person.

If an object of inducement or encouragement to employees of an employer, as above defined, were to force one person to cease dealing with another person, then it would be immaterial whether the person against whom the force was directed actually ceased then or thereafter to deal with such other person. The object or intent of the inducement by the union, if you find any, is material and must be established, as you have been heretofore instructed.

If you find that neither of the defendant unions induced or encouraged the employees of an employer, as plaintiff claims, or that such inducement or encouragement was solely for the purpose of concerted activity on account of wages, hours or conditions of employment, as the defendants claim, or to obtain jobs for themselves, then your verdict should be for all of the defendants.

However, if you find that the plaintiff, by a preponderance of the evidence, has proved that the defendants did the acts of inducement or encouragement as claimed by plaintiff, and that one of the objects was to force one person to cease dealing with another person, as above set out and as claimed by the plaintiff, and that damage to business or property of the plaintiff directly resulted, then you may consider the liability of the individual defendants.

If you find one of the objects of any inducement or encouragement was to force any person to cease doing business with any other person, it would make no difference that the International or Local 8 or the persons whom you find, if you do, were inducing or encouraging, had other objects therein, such as conducting a strike on account of wages, hours or conditions of employment of employees of the Port of The Dalles, or such as forcing or requiring the Port of The Dalles to assign the particular work of unloading the barge to employees of Local 8 rather than to employees in another class. In other words, the forcing of a person to cease doing business with another person, if that be one of the objects of the inducement or encouragement, would be sufficient, even though there might be other legitimate objects in mind.

Even if any acts done or performed by any defendant union were for the purpose of achieving legitimate ends of collective bargaining and the legitimate ends and purposes of trade unionism, such as the prevention of the breaking down of wages and working conditions of Local 8, still, if a defendant union or two or more defendant unions in concert induced or encouraged employees of any employer, in restraint of trade and commerce, as above described, but another object thereof was to force any person to cease dealing with Hawaiian Pineapple Company, then the plaintiff should prevail on that issue.

Now, there is one factor in this case which has not been much discussed, but on which I will give you a few things now. There were certain arguments made upon the matter as to which I think this is pertinent, and also there were certain contentions upon which it bears.

The presence of a member of the Hawaiian Local at the entrance of the property of the Port of The Dalles, whatever his purpose or that of his Local, furnished no justification or excuse for any action or for picketing or for inducement or en-

couragement of other persons or employees by the International or Local 8 or any members thereof.

If you find that a member from the Hawaiian Local had a legitimate reason for his presence at the entrance of the Port of The Dalles, that would furnish no reason, justification or excuse for any action you may find by the International, Local 8, or any member thereof.

. You may, however, consider the presence of the member of Hawaiian Local to determine whether either of the unions had any part therein, and you may also take it into consideration to determine whether one of the objects of any encouragement or inducement of other employees was to force any persons to cease doing business with any other person and to prevent the unloading of the cargo and the transportation thereof in interstate commerce.

There is no evidence in this case that this was a primary strike as far as the Hawaiian Local was concerned.

There is no evidence in this case that the Hawaiian Pineapple Company had any strike of its own employees, or that it was picketed, or that there was any difficulty at the time that the barge left Hawaii.

Now then, we deal with the questions of agency, because that is an important question in this case. The evidence shows that during the time covered by the controversy Louis Goldblatt was an officer and Matt Meehan, William Gettings, Henry Schmidt and Howard Bodine were agents and representatives of the defendant International, and that Robert Baker and Wilfred Mackey were officers, and that Toby Christiansen and Matt Meehan were agents and representatives of defendant Local 8. It is for you to say whether what they did, if anything, in committing or assisting in the commission of the acts charged, or any of them, or in entertaining any objects or purposes, if you find that such acts were committed or that such objects were entertained, was within the scope of their employment.

An association such as the International or Local 8 can act only through its officers and agents. It is liable for the unlawful acts of its officials when they are acting within the course and scope of their employment. It is liable even though such unlawful acts were not authorized or were forbidden if they were done to advance the interests of the principal and were within the scope of their employment. To decide whether these acts were within the course and scope of the employment of the particular official, you must determine that the acts were done when the official was pursuing the business of the union who was his particular principal, and that the union could have foreseen that such unlawful acts might occur in the performance of such employment.

Either the International or Local 8 would be liable if any unlawful acts were directly authorized by it or if they were ratified by it after having knowledge of the acts done on its behalf. In determining whether such acts were authorized or ratified you may consider all the circumstances under which they were done, together with the actions of each union, the International and Local 8, before and after the occurrences at The Dalles.

Plaintiff is required to prove the existence of an agency relationship as to each officer or agent involved and the existence and extent of the authority. Unsworn declarations or statements of the supposed agent himself as to the existence of agency and the extent of authority is not proof thereof. However, agency and extent of authority may be proven either by direct or indirect proof. Direct proof consists of the documents or acts by which the agent was appointed. Indirect proof of agency, and particularly of the scope of employment, may be established by evidence of other facts and circumstances from which it may be inferred.

Even if there is no prior authorization of an agent, the principal would still be liable if, with full knowledge of the nature and character of the acts done by the agent on behalf of the principal, and with the intent to adopt them, the principal subsequently ratifies, approves or accepts the benefit of such agency and the acts of the agent. If, therefore, you find there was subsequent conduct relating to the agency or acts of any agent by the International

after September 28, 1949, but there was no intent to ratify or adopt such acts, that would not necessarily amount to ratification. However, the question of scope of authority and of authorization and ratification are questions for you to decide as matters of fact.

The International at any time had the full right, ability, authority and power to limit the authority of any agent, even though he remained on the payroll of the International. It also had the power to discharge him. The question is one of fact, as far as this case is concerned, as to whether in the things he is proven to have done he was authorized, or that the matters fell within the general scope of his agency, or whether the International expressly ratified his acts thereafter with the intention to do so and with knowledge of the facts.

If you find the International, through its officers and agents, and Local 8, and Local 8 itself, through its officers, agents and members, combined with a common purpose to induce the employees of any employer in the course of their employment to refuse to handle the cargo, with the object of forcing any person to cease dealing with any other person, then you may consider all the evidence to determine whether the acts were done in concert in accordance with the common purpose and to effectuate a common design and, if damage to property or business resulted directly and proximately therefrom, you may consider whether the International or Local 8, or either of them, was responsible for the damage and injury.

If you find neither of the defendant unions is liable under the instructions which I have just given you, then without further consideration you will enter a verdict in this case where Hawaiian Pineapple Company is plaintiff in favor of all the defendants and against the plaintiff.

Now, I want to mark that point. If you find under these instructions that I have just given you that neither of these unions is liable, neither the International nor the Local, then you shall promptly enter a verdict in favor of all the defendants and

against the plaintiff. That includes the individuals and everyone else.

Now if you have, however, found liability under these instructions as to one or both unions, the International and Local, then you may consider the liability of the individual defendants. In other words, you have to find the unions or one of them liable under the first part of the instructions before you can consider any individuals.

As to the liability of the individuals, the plaintiff makes further contentions, and only if you have found that one or both unions are responsible will you consider the claims against the individuals in conjunction with the unions.

The Plaintiff Hawaiian Pineapple Company in this regard claims that the unions and the individual defendants conspired to boycott the cargo of pineapple to prevent plaintiff from unloading the cargo of pineapple and from having the same shipped in interstate commerce and to injure and damage the business and property of plaintiff and to induce and encourage employees of employers to engage in a concerted refusal in the course of their employment to transport, handle, work on or perform any services in connection with the cargo of pineapple, and that an object of the inducement or encouragement was to force or require certain employers and persons to cease doing business with plaintiff and with certain other persons, and to force plaintiff to cease doing business with certain other persons.

The defendants, and each of them, deny these claims and particularly that there was a conspiracy of any kind, and also make the claims which I have set out above.

A conspiracy in restraint of trade or commerce between the Territory of Hawaii and any state, whereby any person is injured in his business or property, and which was accomplished by inducing and encouraging the employees of an employer in concert in the course of their employment to refuse to handle or transport any goods or commodities, such as pineapple, or to perform any services in such connection, where an object of said induce-

ment or encouragement was to force any person to cease dealing with an employer or any other person, would be actionable by the person suffering such damage in person or property against any defendant who did acts in furtherance of said conspiracy, knowing at the time of the illegal design.

If you find from the evidence that the individual defendants, among themselves or together with the Defendants International and Local 8, or either of the unions, conspired together to restrain trade and commerce between the Territory of Hawaii and any state of the United States, and to encourage or induce the employees of any employer by concerted action in the course of their employment to refuse to transport, handle or work upon a cargo of pineapple at The Dalles, Oregon, or to perform any services in connection therewith, with the object of forcing any employer or other person to cease doing business with any other person, and with the purpose of doing injury to the business or property of the plaintiff, and that said damage to business or property was actually accomplished, then plaintiff is entitled to recover against any individuals who, knowing of the unlawful intent, did any act in furtherance thereof and reasonably calculated to effect the object of the conspiracy.

A conspiracy is an agreement between two or more persons for the purpose of doing an unlawful act by lawful means or doing a lawful act by unlawful means. Once formed, a conspiracy may be joined by any person who, knowing of the common design, aids or assists in the consummation thereof or does an act in furtherance thereof, reasonably calculated to accomplish the end. From the time of the formation of the conspiracy or the participation therein by anyone who knows of the common design, each of the persons found to be members thereof is responsible for any of the acts done by any party or person in pursuance of the conspiracy and to effect the common design, and is bound by all utterances and declarations of any other conspirator in furtherance of the common design.

A conspiracy may be proved by direct evidence or by the proof of such circumstances as naturally would tend to establish it and which are sufficient in themselves to satisfy an ordinarily prudent person of the existence thereof. It is not necessary that such an understanding be shown to be in writing. It is sufficient if the evidence shows a concert of action between two or more persons to accomplish an unlawful purpose.

It is possible for one of the defendant unions, through its officers or agents, or through another union, acting within the scope of their employment, to commit the acts outlined above with the object and purpose therein stated or to act jointly or in pursuance of a common purpose or design. If the agents of either union, duly authorized and acting within the scope of their authority, participated in the formation of a conspiracy and did the unlawful acts charged, then you may consider whether the particular union was a member of the conspiracy.

If you find there was no conspiracy involving any individual defendants, then your deliberations will be confined to the defendant unions alone in accordance with the previous instructions. If as to any individual defendant you find he was not a member of such conspiracy or did no act in furtherance of any conspiracy, knowing of the common design and with the purpose of aiding and abetting the common object, then you should find in favor of that defendant.

An individual defendant may be a participant in a combination or conspiracy if, knowing thereof and of the objects and purposes thereof, he personally does an act in furtherance of the conspiracy and reasonably calculated to carry on the purposes and objects thereof. No individual defendant can be held liable merely because he may have been a member or officer of one of the defendant unions, even though you find the particular union is a participant in the conspiracy. No individual defendant should be held liable because of acts of other individual defendants in which he did not participate, aid or coun-

sel and which he did not authorize or ratify with full knowledge thereof.

In any of these cases if you conclude that any individual defendant has not participated in any of the acts charged to the extent that I have indicated as necessary to make a defendant liable, you should return a verdict in favor of such defendant.

If you find that the International, acting through its agents or officers, in the course of their employment, or through Local 8 and Local 8 itself, through its officers and agents or members, in the course of their employment, induced or encouraged employees of any employer to engage in a concerted refusal in the course of their employment to transport or otherwise handle any goods, articles or commodities, or otherwise handle, work on or perform services in connection with any goods, if one of the objects of the inducement and encouragement was to force or require any person to cease doing business with any other person, and as a direct result plaintiff was injured in business or property, then you may find liability against both the union defendants.

If you find only one is so liable, then you will find liability against such defendant.

If you do not so find, you will return a verdict for all defendants and against the plaintiff.

But if you find one of the defendant unions liable, or both of the defendant unions liable, and if on further consideration you find that the defendant union, or unions against whom you have found liability further entered into a conspiracy, as above described, with the individual defendants, you will add to the verdict the names of all the individual defendants against whom you find.

I will have to consider the form of verdict later. This is the substance of it.

If you find a verdict against any defendant you will then assess the damages Plaintiff is entitled to recover against the defendant or defendants whom you find liable. But in this case the amount of damages is always the same. In other words, the plaintiff is not entitled to recover any more against a group of defendants than it is against one defendant, because the amount of damage or injury to property, if you find that was the direct and proximate result of anything that was done in this case, remains the same. Of course, you will have to assess that.

Now, the mere fact that I go on now to give you the rule of damages does not mean that I am instructing you to find liability. That is a question for you, but I have to cover the whole case and instruct you on all of it. So I shall now give you the rule of damages, if you should find anybody liable and find that there are any damages due.

In the case of Hawaiian Pineapple Company you cannot give a recovery for any loss of profit. You are not to apportion damages among the defendants if you find several liable, but you are to return damages in a lump sum against any or all of the defendants whom you determine to be liable.

In the case of the plaintiff, Hawaiian Pineapple Company, against the International you should consider, in determining the amount of recovery, all damages to its business and property directly and proximately resulting from the unlawful action of the defendants. You should take into consideration such items, if you find there was such damage, so resulting, as the cost of repairs to the trucks, crane and barge; you should consider the value of the pineapple destroyed, if you find any was destroyed; you may consider the cost of the extra equipment and labor necessarily expended and shrinkage suffered by the Pineapple Company. However, the defendant or defendants are only liable for the reasonable and necessary expenses resulting from damage or injury to property, and are not liable for excessive or improper expenditures.

In this case, if you do award damages, you must remember that it is the duty of plaintiff to minimize the damages as far as reasonably possible. Therefore, if you find that plaintiff is entitled to recover damages but that it could have reasonably, in the exercise of due diligence and fair business practices, have minimized the amount thereof by taking any measures

suggested in the evidence, you are entitled to consider that factor in assessing damages.

In the case of Hawaiian Pineapple Company vs. The International Longshoremen's & Warehousemen's Union you are not authorized to award any damages for the purpose of punishing any defendant or defendants or of setting an example. I mention that because the rule is a little different in the cases regarding the individuals, and I will take that up when we get to it.

As far as the Curto and Rosales cases are concerned, the Court will cover these together, since the principles of law are the same.

You will remember that the plaintiffs claim in these cases, and each of them, that there was a combination or conspiracy for the purpose of doing illegal acts, that as a result thereof there was a riot, and that during the course of the riot a large number of the defendants attacked the plaintiff, struck him, beat him, and kicked him, and as a direct and proximate result he claims to have sustained damages.

The defendants deny that there was any conspiracy which had for its purpose the injury of the plaintiff or the commission of any other unlawful act, and claim that plaintiff did not incur any medical or hospital expenses, and that they did not act in conspiracy or concert in rioting or other unlawful occurrence at the time and place claimed, and particularly they contend that there was no drinking or that there was any arming with deadly weapons. · They contend that they did not either individually, concertedly, or as a result of any unlawful agreement or conspiracy of any kind, commit any acts of violence upon the person of the plaintiff.

These are the contentions in both cases. They also contend that any injuries sustained by plaintiff were not the result or caused by any willful or wanton or deliberate acts of the defendants, or any of them. Likewise, they contend that the particular plaintiff participated and proximately caused any injuries by carelessly, negligently and wantonly operating his truck in such a way as to almost run down certain people standing near a picket line at the Port of The Dalles at the time in question.

The striking or beating of a person without his consent is unlawful unless justified, and if any person is assaulted, struck or beaten without his consent he has a cause or claim against the defendants liable. If you find that either Plaintiff Curto or Rosales was struck or hit by any of the defendants, I charge you that such act is unlawful, since no evidence of justification or consent was offered in this case.

Plaintiff in the particular case, if you find he was beaten or struck by any defendants by a preponderance of the evidence, is entitled to recover against any defendant whom you find from a preponderance of the evidence struck, kicked, hit or touched him without his consent.

Plaintiff is entitled to recover against any defendant whom you find by a preponderance of the evidence, being present, counseled, assisted, aided or abetted any defendant whom you find did strike the plaintiff.

If you find by a preponderance of the evidence in either of the individual cases of Curto or Rosales that the defendants so named, acting in concert, were engaged in an illegal act or a series of acts, and were acting in concert as a result of a preconceived design, even though the action was taken on the spur of the moment, and as a result thereof and in the course thereof a particular plaintiff was injured or struck by one or more of the defendants, acting in accordance with the common design to accomplish an illegal act, then each of the defendants whom you find so acting would be individually responsible for any injury to the particular plaintiff, whether he struck the blow or not.

If the defendants were so acting together, and were in the commission of an unlawful act, and in the course thereof a particular plaintiff was injured, all the defendants whom you find by a preponderance of the evidence were acting in concert and doing the acts in accordance with a common design, with the purpose of carrying that out, would be liable for the injury and damage to the particular plaintiff.

If you arrive at this point—and again I say to you that I express no opinion on the merits of the case by giving you the rule of damages—then you must prepare to calculate the damage suffered by the particular plaintiff as a natural and probable consequence of any unlawful act done by the particular defendant in striking the particular plaintiff, as you have been heretofore instructed.

If you find that either of the plaintiffs in the personal injury cases is entitled to recover, then you shall award to him as damages such amount as will fully, fairly and completely compensate him for any injury he may have received, and for physical pain and suffering, if you find he sustained any, and for compensation for such time as he has lost from his work or employment, if any, together with any expenses occasioned by the injury or by absence from work in so far as these items are shown by a preponderance of the evidence to have been the direct and proximate result of the wrongful act of the defendants or any of them. This computation will be made fairly, and without passion or prejudice.

In either of the individual cases if you find any one or more of the defendants is liable for compensatory damages, then you will leave his name in the verdict which I will give you. Then you will consider the question of punitive damages. You will not award any punitive damages unless you find that the particular defendant or defendants against whom you have awarded compensatory damages acted with malice and with oppression and under circumstances of aggravation.

If the assaults in the individual cases were only the consequence of sudden heat and not the result of a design for the injury of the plaintiff deliberately formed by the particular defendant or defendants against whom you have awarded compensatory damages, then you should give that circumstance great weight in determining whether to award punitive damages under the rules I have heretofore given you.

Punitive damages are never a matter of right, and are only allowed, if at all, when a preponderance of the evidence proves that the defendant under consideration has been guilty of oppression or malice.

Now, these amounts of damages are to be awarded fairly. Punitive damages are awarded under very special circumstances alone, where you find that there were circumstances of malice or oppression and that the defendants against whom compensatory damages are awarded were acting with hearts bent upon evil. They are awarded for the purpose of punishment for malicious and oppressive acts and not on any other basis.

Again, because I give you the rule of punitive damages does not indicate any desire on my part to suggest to you that you should award punitive damages or compensatory damages, as far as that is concerned, because these are questions of fact which are solely for you.

You are the sole and exclusive judges of the facts in this case and the credibility of all witnesses. Your power of judging the effect or value of evidence, however, is not arbitrary but must always be exercised with legal discretion and in subordination to the rules of evidence.

The direct evidence of one witness to whom you give full credit and belief is sufficient to establish any issue in this case.

You are not bound to find a verdict in conformity with the declarations of any number of witnesses which do not produce a conviction in your minds as against the testimony of a less number or against other evidence or inferences from evidence which does satisfy your minds.

Every witness is presumed to speak the truth. This presumption, however, may be overcome by the manner in which he testifies, by the character of his testimony, by the interest he may have in the outcome of the case, or by evidence affecting his character or motives, or by contradictory evidence.

If you find that a witness has testified falsely in any one material part of his testimony, you may look with distrust upon the other evidence given by such witness; and if you find that any witness has testified willfully falsely you will be at liberty

to entirely disregard all the evidence given by such witness unless corroborated by other evidence which you do believe.

Any fact in this case may be proven by direct or indirect evidence. Direct evidence is that which tends to prove a fact in dispute directly, without any inference or presumption, and which in itself, if true, conclusively establishes the fact. If a witness testifies to a transaction to which he has been an eye-witness, that is direct evidence.

Indirect or circumstantial evidence is that which tends to establish a fact in dispute by proving another, and which, though true, does not in itself conclusively establish the fact but affords an inference or presumption of its existence.

You should look with caution upon the oral admissions of a party, as that kind of evidence is subject to mistake. The party himself may have been misinformed, he may not have clearly expressed his meaning, or the witness may have misunderstood him.

Now, Ladies and Gentlemen, before I finally submit this case to you there are some questions of law which I am going to discuss with regard to the case, so at this time I will excuse you. When you come back in I will give you instructions as to the forms of verdict and the way in which you will handle them. I will then submit the case to you. You may take a short recess.

(Thereupon the Jury retired from the courtroom and the following occurred out of the presence and hearing of the Jury:)

The Court: You may take your exceptions.

The Court: Now, Ladies and Gentlemen, the Court is about to submit these cases to you for decision on the facts. You will have with you in the jury room all of the documents which have been introduced in evidence. You will also have with you two forms of verdict in each separate case; that is, six forms of verdict.

Now, in the case of Hawaiian Pineapple Company vs. the International Longshoremen's & Warehousemen's Union, No. 5183, omitting the formal portions, the first part of this verdict reads as follows, if you should find for the plaintiff and against any defendant:

"We, the jury, duly empaneled and sworn, return our verdict in favor of the plaintiff and against the defendants hereinafter named, and assess the plaintiff's damages in the sum of blank dollars."

Now, in that line, if you find a verdict for the plaintiff and against any defendant, you would fill in the amount of damages which you think the plaintiff would be entitled to under the evidence and under the instructions.

Now then, the verdict says: "This verdict is returned against the following named defendants." Then there is an instruction: "Strike out the names of any defendants listed below against whom you do not intend to return a verdict."

As I told you, you will consider the first part of the instructions, and if you find either or both of the unions liable thereunder then you will leave those two names, or one of them, according to your finding, in the verdict. If you do not find either of the unions liable upon the first part of the instructions relating to specific acts and intent, then you will use the other form of verdict:

"We, the jury, duly empaneled and sworn, return our verdict in favor of the defendants and against the plaintiff."

If you find one or both of the unions liable under the first part of the instructions, then you will consider whether any individual is liable, also. And the names of the individuals are placed on the verdict. You will hold an individual defendant liable only if you find there was a conspiracy as charged in the complaint by the plaintiff and in the instructions.

Now, if you find liability on the conspiracy theory you will remember the instructions with regard to that, and then you will strike out any individual defendants against whom you feel you should not return a verdict. And, finally, I assume, you would assess the damages.

831

Whichever form of these verdicts you use in this case will be signed by your foreman alone. This case is tried in the United States District Court, and therefore any verdict you return, whatever it is, must be unanimous. Any verdict must be unanimous. Therefore, before you report any verdict to the Court in any one of these three cases, check up to see with regard to that verdict that you are in unanimous agreement as to every feature, the liability of defendants, the amounts, and all other features connected with it, because you all have to agree to every verdict which you bring in or you cannot return it.

Now, turning to the Curto case, there the form of verdict for plaintiff reads as follows:

"We, the jury, duly empaneled and sworn, answer the question submitted to us by the Court as follows:

" 'Does the hereinafter named defendants' liability to plaintiff arise from willful and malicious injuries to plaintiff's person.' "

You would answer that "Yes" or "No." You must be unanimous in that answer.

Then it says: "We further return our verdict in favor of plaintiff and against the defendants hereinafter named, and assess the plaintiff's damages in the sum of blank dollars compensatory damages."

Now, if you answer the first question "No," and say that it does not arise from willful or malicious injuries, then you will only award compensatory damages. If you answer that first question "Yes," then you may go further and award punitive damages.

Then this says: "This verdict is returned against the following defendants," and then: "Instructions: Strike out the names of any defendants listed below against whom you do not intend to return a verdict." The names are listed, and of course you will treat that the same way.

If you find that plaintiff is not entitled to recover, then you will use this verdict:

"We, the jury, duly empaneled and sworn, return our verdict in favor of defendants and against the plaintiff."

Now, all features of any verdict that you return in these cases must be unanimous. Whatever verdict you return will be signed by the foreman alone.

In the case of Rosales, Civil 5105, we have the same situation. There the text of the verdict for plaintiff reads as follows:

"We, the jury, duly empaneled and sworn, answer the question submitted to us by the Court as follows: Question: Does the hereinafter named defendants' liability to plaintiff arise from willful and malicious injuries to plaintiff's person?"

Then there is a blank line for the answer, and that question you will answer "Yes" or "No." If you answer it "No," you will go on and answer the next question:

"We further return our verdict in favor of the plaintiff and against the defendants hereinafter named, and assess plaintiff's damages in the sum of blank dollars."

In that you will fill in any amount of compensatory damages which you find. If you answer it "Yes," then you will not only award compensatory damages in the sum that you fill in but also you may award punitive damages, if you feel that that is proper.

There is one rule that you must remember. You cannot award any punitive damages unless you award compensatory damages. In other words, you cannot punish someone just out of thin air. You have to find first that the plaintiff has been injured, that the defendants are responsible, and there is so much damage by way of compensation before you can award any punitive damages whatsoever.

With regard to punitive damages, I again suggest that you use discretion.

Now, in the event that you find the plaintiff Rosales is not entitled to recover, you will use this form of verdict:

"We, the jury, duly empaneled and sworn, return our verdict in favor of the defendants and against the plaintiff."

Again, on the plaintiff's verdict, the names of the defendants are listed, and you

832

will strike out those against whom you do not find, if you determine to find a verdict for the plaintiff.

Now, Ladies and Gentlemen, that concludes this case as far as the Court is concerned. As I said before, I submit it with the utmost confidence that you will fairly and properly settle the issues of fact which are now comitted to you.

Swear the Bailiffs.

(Bailiffs were thereupon sworn and the jury retired to consider of its verdict.)