INTERNATIONAL LONGSHOREMEN'S
& WAREHOUSEMEN'S UNION (CIO)
and International Longshoremen's &
Warehousemen's Union, Local 8, Appellants,

v.

HAWAIIAN PINEAPPLE COMPANY,
Ltd., a corporation, Appellee.

HAWAIIAN PINEAPPLE COMPANY,
Ltd., a corporation, Appellant,

v.

Martin E. ADEN et al., Appellees.

No. 13673.

United States Court of Appeals
Ninth Circuit.

Oct. 25, 1955.

Rehearing Denied Jan. 11, 1956.

Gladstein, Andersen & Leonard, Norman Leonard, San Francisco, Cal., Nels Peterson & Frank Pozzi, John F. Conway, Portland, Or., for appellant.

Krause & Evans, Gunther F. Krause, Dennis J. Lindsay, Gerald H. Robinson, Portland, Or., for appellee.

Before HEALY, BONE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

The issues here arise out of an industrial conflict. The principal situs of the events under suit was at the Columbia River port of the City of The Dalles, Oregon.

Below, the plaintiff was Hawaiian Pineapple Company, Ltd., (hereafter "Pineapple"), a corporation organized under the laws of the Territory of Hawaii. Principal defendants were the International Longshoremen's & Warehousemen's Union (hereafter "International"), Local 8 of the International Longshoremen's & Warehousemen's Union (the Portland, Oregon, local, hereafter "Local"), and various individual longshoremen, members of Local or officers or agents of International.

The events in suit happened mainly between September 24, 1949, and October 27, 1949.

Trial was by jury. A verdict was rendered in favor of Pineapple against International and Local for $201,274.27. The jury about-faced and rendered a verdict in favor of the individual defendants and against Pineapple.

Background information should be reported. In the summer of 1949 International's local unions in the Territory of Hawaii were engaged in strikes and picketing against others than Pineapple. Transportation to and from the islands had dwindled to a trickle. Pineapple

had pineapple in Hawaii and it had California fresh fruits about ready for the cannery of a subsidiary at San Jose, California. At the California cannery each year canned Hawaiian pineapple would be uncanned, then would be combined with mainland fruits and recanned to produce canned fruit salad. It is to be noted that the process involved canning fruits other than pineapple only once.

Common carriers, tied up in the Islands, were unavailable to move Pineapple's pineapple to California. Therefore, Pineapple decided to move as its own self-carrier some of its cases of pineapple packed in No. 10 cans. Through its wholly owned subsidiary, Isleways, Ltd., it chartered an ocean-going barge, arranged for an ocean-going tug to tow the barge to the mouth of the Columbia River and a river tugboat to take the barge to The Dalles, the river port selected as the water destination.[1] The Dalles is a small port and not noted for coastal traffic. Prior to September, 1949, it seems to have escaped any serious attention from International or Local. The port obviously was selected by Pineapple because of the absence there of International and its locals.

Pineapple arranged for the services of a boom crane of the Goodat Company. This company was willing to sell its service to unload Pineapple's pineapple, but after a day or two of Pineapple's unloading troubles, Goodat had all of Pineapple's problems it wanted and sold the crane to Pineapple on a "do-it-yourself" basis.

Pineapple planned to transport the pineapple from The Dalles to San Jose by the trucks of various trucking companies and also by rail freight out over the Union Pacific, which serves The Dalles.

Below is a list of some of the troubles that developed for Pineapple in trying to unload the barge at The Dalles:

1. Before the arrival of the barge at The Dalles on September 24, 1949, Matt Meehan, a representative of International in the area, tried to dissuade the officials of the Port of The Dalles from letting Pineapple use the port and facilities.

2. On September 25, members of Local from Portland came to The Dalles in private cars and formed a picket line outside the dock of the Port of The Dalles. This line was maintained for some days.

3. Longshoremen met California teamsters in their trucks at a distance of several miles from The Dalles and tried to dissuade them from coming to The Dalles to pick up cargo. Four trucks, however, on September 28, 1949, came on through to the docks. Extra local police were on duty, but the longshoremen reacted violently to the arrival of the trucks. They broke through the police guard, ran to the dock. In the ensuing riot, the truck drivers were threatened and two were beaten. (The trucks went back to California empty.) The Goodat crane was attacked, but no serious damage was done to it. Unsuccessfully the mob tried to cut the barge loose. Over 400 cases of pineapple were tossed into the Columbia River.[2]

4. After the riot the picket line dispersed, at least for a time, but bevies of longshoremen from Portland continued for several days to walk the streets of the little town.

5. The tug languished at the dock until October 19, when Pineapple started to move the cargo via Union Pacific.

1. The original destination of the barge was Tacoma, Washington, where longshore work was dominated by an American Federation of Labor union. En route, it became apparent that the barge would have about as much trouble unloading at Tacoma as Pineapple thought it would have at I.L.W.U. seacoast ports, which were reported to be refusing at the time Hawaiian cargo.

2. Subsequently, in an Oregon state court criminal proceeding, a number of longshoremen pleaded guilty to an indictment for riot at the Port of The Dalles. The indictment emphasized the physical assault upon the truck drivers.

Freight cars were moved on to the dock, a picket line immediately formed again. Another stalemate followed. Eventually, the cargo did move to San Jose beginning on October 26. At the time the strife ceased, an announcement was made that the Port of The Dalles had made some sort of concession to the longshoremen, but no contract was entered into between the port and Local, if such the port could. The concession was principally higher wages for the longshoremen who, we take it, remained non-union.

Earnestly, Pineapple appeals from the judgment which permitted the individuals to escape liability and International and Local cross-appeal, seeking relief here from the judgment against them. For reasons hereafter stated, the judgment rendered below will be affirmed as to all parties before this court.

Section 303 of the 1947 Labor-Management Relations Act is found as 29 U.S.C.A. § 187. So far as pertinent, it reads as follows:

"§ 187. Boycotts and other unlawful combinations; right to sue; jurisdiction; limitations; damages

"(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

"(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

\* \* \* \* \* \*

"(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under subchapter II of this chapter.

"(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

The charges against International and Local are laid primarily under the foregoing section, although the trial court thought as to these two a case was also stated against them under the common law.

It should be pointed out that in this case a pre-trial order was formulated.[3] First, it listed the admitted facts, then set forth the contentions of the respec-

3. The contentions and issues of the pretrial order are set forth as Appendix "A" to this opinion.

tive parties, and then listed the issues. Then it concluded with a statement that the order superseded the pleadings. Further, it provided that the order should not be amended except to prevent manifest injustice. Both parties approved the order and no effort was ever made to amend it. Such a type of pretrial order does tend to channelize contentions and does remove some of the flexibility lawyers ordinarily have under the Federal Rules of Civil Procedure, 28 U.S. C.A. It is not intended here to comment on the advisability of the practice, but rather to point up the feature which will appear important, particularly with reference to the appeals of the individual defendants.

Of the events surrounding the unloading of the barge, it seems fair to say Pineapple contended all were a part of an attempt to isolate the whole Territory of Hawaii. Aside from the "we didn't do it" defenses which defendants usually and naturally present, Local (or local members particularly) claimed to be concerned with wages and working conditions at the Port of The Dalles, a municipal entity. No suggestion is made that International or Local was bargaining agent for anyone employed by the Port of The Dalles. Some contention was made that Pineapple was the alter ego of companies in Hawaii against whom units of International were on strike. This latter contention does not seem to have been proved to the point of any jury question.

Without fixing any responsibility for the moment, the resistance to the unloading at The Dalles seems to have followed a pattern of complete resistance to "hot cargo" and the resistance reached lawlessness and brutality.

The issues properly went to the jury on the basis that International, Local and the individuals had no relation of employer and employee with Pineapple and that there was no legal excuse for any defendant to attempt to boycott a cargo of Pineapple, if such they did.

*The appeal of International and Local*

Of course, the Local and International abstractly could do nothing. Things, if done by them, had to be done by officers, agents or members. The court instructed that certain persons were agents.[4] It did not give long instructions requested by the unions on "authority." It would appear that the unions were fairly protected when the court said to the jury [107 F.Supp. 824]:

> "The evidence shows that during the time covered by the controversy Louis Goldblatt was an officer and Matt Meehan, William Gettings, Henry Schmidt and Howard Bodine were agents and representatives of the Defendant International, and that Robert Baker and Wilfred Mackey were officers, and that Toby Christiansen and Matt Meehan were agents and representatives of Defendant Local 8. It is for you to say whether what they did, if anything, in committing or assisting in the commission of the acts charged, or any of them, or in entertaining any objects or purposes, if you find that such acts were committed or that such objects were entertained, was within the scope of their employment."[5]

If a party receives the substance that he is entitled to in an instruction, he cannot complain that the

---

4. The instructions given by the trial judge are appended to his decision on the motion for a new trial reported as Curto v. International Longshoremen's & Warehousemen's Union, D.C., 107 F.Supp. 805, at page 817. In view of the prior publication of the complete instructions, this court's opinion will be shorter than it otherwise would be were it not for such publication. This opinion is written on the assumption that he who reads it will have first read Curto in its entirety. (The individual judgments in favor of Curto and Rosales were not appealed. The parties inform the court that those claims have been settled.)

5. Further agency instructions are contained in the complete instructions. See footnote No. 4.

court did not use his words. This instruction and the others were adequate.

■■ By section 301 of Taft-Hartley, 29 U.S.C.A. § 185, an employer or a union is "bound by the acts of its agents" and "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." Surprisingly, there is little case law yet on the agency feature of the section. Probably the practical result of the section in the case of labor unions was to restore the general rules of agency, particularly the rules of apparent authority which had been curtailed by the Wagner Act, 29 U.S.C.A. § 151 et seq. and the decision of United Brotherhood of Carpenters and Joiners of America v. United States, 330 U. S. 395, 67 S.Ct. 775, 91 L.Ed. 973. We think the section was intended to cover the acts of officers of the union who deal with employers or with the public. That is, if a union puts or lets an officer or other representative get into a position where he can and does cause trouble proscribed by the act then the union is responsible.

■ The unions could not have been held in this case without a finding by the jury that some one or more persons in authority were responsible for what transpired, either the union officers named as individual defendants or some officials or agents not parties. It could not be sustained against the unions on the bare conduct of the rank and file.

The instructions covered the factor of "scope of the employment" in a manner which certainly under the Labor-Management Relations Act, 29 U.S.C.A. § 141 et seq., was as favorable as Local and International could ask.

Again, it is specified as error that the jury was not adequately instructed on minimization of damages. The court instructed:

"In this case, if you do award damages, you must remember that it is the duty of plaintiff to minimize the damages as far as reasonably possible. Therefore, if you find that plaintiff is entitled to recover damages but that it could have reasonably, in the exercise of due diligence and fair business practices, have minimized the amount thereof by taking any measures suggested in the evidence, you are entitled to consider that factor in assessing damages."

■ The instruction was adequate. It is to be remembered that jury instructions can grow so long and so interminable that the sheer weight of them can make them plain useless. If a point is adequately covered, and it was, succinctness is to be commended and not criticized.

■ International and Local also assert the judgment must be reversed as to damage because the evidence conclusivly shows Pineapple did not mitigate its damage at San Jose, California, at the canning plant of Pineapple.[6] The arguments go to matters of business judgment. The arguments advanced are quite convincing but fall short of satisfying us that we should hold as a matter of law that Pineapple did not use sound judgment or attempted to pile up its damage. One thing, for example, its course of conduct, the jury may have thought, may have been dictated by an attempt to hold its trade built up through the years. Also, Pineapple may have reasonably thought from day to day its trouble with the defendants would be over tomorrow. That may have influenced Pineapple's course of action. Minimization here was strictly a jury ques-

6. The verdict of $201,274.27 was somewhat less than the prayer of Pineapple's complaint, but it was for the total amount that plaintiff argued to the jury it was entitled to receive. Principal items were physical damage at the dock of The Dalles, consequential damage at The Dalles (such as cost of watchmen and extra rent of facilities) and consequential damage at Pineapple's Barron-Gray division at San Jose, California, where the cost of the company's product was increased.

tion. Either conclusion on minimization which the jury might have adopted should be sustained.

■ Defendants proffered an instruction which said, in effect, that the Taft-Hartley law was not violated if the longshoremen talked to truck drivers employed by Pineapple and told them the cargo was "hot" or told them that working conditions and wages were threatened at the Port of The Dalles. Part of International's and Local's contentions must be postulated on carrying Section 8(c) over to qualify Section 303. That would appear to be concluded by Printing Specialties and Paper Converters Union Local 388, A.F.L. v. LeBaron, 9 Cir., 171 F.2d 331. If otherwise applicable, facts in the case would not seem to admit of the introduction of the elements of 8(c) herein. There is no merit in the specification.

■ The defendants International and Local press the point that there is a logical inconsistency in the jury's finding them liable and exonerating the individual defendants from any liability. As a practical matter it does seem a little difficult to understand why the jury found International and Local liable and did not also hold some of the leaders responsible. However, if there be an inconsistency in the verdicts which might have justified a trial court in granting a new trial, it may nonetheless stand on appeal even though inconsistent. That is the jury's prerogative.

However, we think there was a difference in the theories upon which the possible liabilities of the defendants were projected. In considering this point we must keep in mind that the trial court held the plaintiff to an all-or-nothing recovery against the individuals and required as a condition of their liability that a union first be found liable. Below, the unions wanted verdicts prepared which would have permitted the finding of varying amounts against varying individual defendants. The court rejected the postulate and of the rejection no defendant has complained here, although complaint is made by Pineapple that the jury was not permitted to consider the liability of all individuals for a common sum different from the sum of liability found as against International and Local. Conspiracy is not any necessary element of Section 303 liability of International.

No one knows what the jury thought, but it may have thought:

1. Only individual International and Local officers not parties defendant had the object from beginning to end of causing others through pressure on others' employees to cease dealing with Pineapple—that the leaders named herein as defendants had a legitimate object.

2. Some damage, slight or great, may have occurred from the unions' activities before the minimum of two individuals formed any conspiracy. In such an event the strait-jacket as to damages—the same amount against the individuals as against International or Local—would have justified the jury in returning a verdict in favor of the individuals.

3. The central figure, agent Meehan, perhaps, was the man who triggered the whole performance. It may have found the basis to fix the liability on Local and International solely in one man, for example, Meehan, or some other man. It may not have thought one man, even though he acts for another so as to bind another, can be guilty of a concert of action, that is, that he couldn't conspire or act in concert with himself.

Of course, upon a straight case of trespass or trover some defendants who participated in the destruction of pineapple on the docks would have been absolutely liable for that damage, but still under the no-liability theory for less than all acquiesced in by plaintiff, it affords no basis to attack the verdict because we know that certain individuals were necessarily liable for a fraction of the total damage. Indeed, International and Local do not urge that the inconsistency lies in exonerating the rank and file who held no office or position. They really urge that it is in exonerating the

leaders; at least that is the effect of their arguments.

It well may be in the inviolate sanctum of the jury room, the jury in considering the liability of International and Local, which it was bound to do first thing, did find the liability through the activities of two, three, four or five agents or officials actually named as defendants individually and their conduct had the element of conspiracy in it. It may be that, having fixed that liability, it passed on to consider the liability of individuals, that it may have its eyes then solely on the rank and file and thought that to impose total liability as to them was impossible. It may have overlooked a few officials and agents who should have been held liable, in view of its first determination on International and Local. But we cannot presume that the jury didn't do its duty. The presumption is that it did its duty. And especially is this true where there were combinations of permissible findings that were not inconsistent. But if plain inconsistent, that was the jury's prerogative here. See Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L. Ed. 356, 80 A.L.R. 161; Jayne v. Mason & Dixon Lines, 2 Cir., 124 F.2d 317. If the master and servant cases cited by International and Local were applicable, the short answer would be: Possible combinations of facts existed which would make the verdicts consistent within themselves. Also, we are sure an additional quantum of proof was required as to the officials of International and Local who were actually named as defendants than as against the unions.

So far as International and Local are concerned, the trial court's instructions were, in our opinion, irreproachable. They gave International and Local everything to which they were entitled. In cases of doubt, the doubts were generally resolved in their favor, e. g., those on the law of agency. The instructions incorporated the ordinary rules of appointment, ratification, authorization and ratification without any real discount because of Section 301, 29 U.S.C.A. § 185. The instructions are cohesive, succinct and seem eminently fair. Also, they have avoided well the pitfalls that one may expect in a new field.

Specifications of errors not mentioned above but made by International and Local we have examined and found without merit.

### The liability of the individuals

On the controversy of Pineapple versus the individual defendants we find the contentions of the parties and issues set forth in the pretrial order, the trial court's instructions, the objections to the instructions and to the form of verdict all very, very confusing. This is not due to shortcomings of the trial judge who presided or to lack of skill of the capable lawyers on both sides who tried the case. As of the time the case was in the district court, United Const. Workers, Affiliated with United Mine Workers of America v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L. Ed. 1085, and other cases had not been decided.

The jury was instructed that it could not find any individual defendant liable if it did not first find International and Local liable. We think it may be said that that was probably a mistake. There was obviously diversity of citizenship here and over $3,000 in controversy. However, the jury did find that International and Local were liable and that in our view removes most of the objections to the trial court's requirement that the liability of International or Local was a prerequisite to the liability of the individuals. We think that had the jury not found International or Local liable the instructions would require a reversal. But, distilling the case down, we think that Pineapple did in the end project its case for liability on the basis of a common sum against all, that is, as against all defendants found responsible.

We are not unmindful of the fact that uncontroverted and incontrovertible evidence was offered showing certain members of Local damaging property of Pineapple. But in that alone there was a

possibility of liability of many for varying amounts, and a possibility of joint liability of many individuals for all or part of the property damage, but still far short of the total damage for which the unions were found responsible.

As we see it, the gravamen of Pineapple's complaint as submitted to the jury on the individuals was that they violated Section 303 of the Labor-Management Relations Act. That is not to say that the act created any new liability as against individuals. Rather it is a belief that individuals whose conduct meets the tests of Section 303 undoubtedly offend the common law of the state of Oregon. For that, we think it is a corollary of Laburnum that individuals may be brought to heel in a diversity case with the required $3,000 in controversy, and we think the Labor-Management act did not abolish by implication the common law tort liability of individuals. The individual defendants seem to concede in the supplemental brief filed by them that a case against them was entitled to go to the jury under the law of Oregon, but they stand on the ground that concert of action, if it existed, was not found by the jury to be coextensive with that of International and Local. In view of the defendants' concession, futility will not be advanced by us by seeking to prove what defendants admit. Before Laburnum there was good argument that Section 303 of the Labor-Management Relations Act did abolish individuals' liability.

Practically, the instructions defined conspiracy as "a concert of action." We do not think Pineapple's contentions were framed to permit a verdict against one individual alone. We think, the unions being held responsible, there was little room to find any of the individuals liable other than in concert with the union, albeit that if the unions had not been found liable, two or more individuals might have been found liable under the evidence, not under the instructions. Stated another way, assuming one or more agents of the International and Local were acting within scope of their authority or apparent authority, there could be little doubt of the liability of International and Local for the full amount of the damage. We agree with counsel for individuals that when counsel for Pineapple said, in discussing the form of the verdict, the following:

"Personally, we would prefer to have it submitted to the jury on just one theory, but it seemed to us that there was a possibility that the jury might want to do that, and I think they could on the evidence. However, in our view of the case this was a conspiracy and every part was a part of that conspiracy. Under the law, as we understand it, a conspirator coming into the picture a few days later than another is not relieved of the damages that have accrued at the time he entered the conspiracy,"

at that point the trial court was entitled to put Pineapple on an all-or-nothing basis for the same amount as to each defendant found liable. Therefore, we cannot see that Pineapple's objections to the instructions were well taken in the light of eventualities—although (repeating again) we think that had International and Local been found not liable, the objections would have been good.[7]

[11] Counsel for defendants remind us that evidence of violence is no substitute for the proper answer to legal questions. Nevertheless, we find it appropriate to comment on the whole case. Here we had an exceptionally well documented story of terrible lawlessness for which the peers (Oregon neighbors of the individual defendants) in the jury box found International and Local, and we think rightly so, responsible. There is evidence of damage on the dock of the Port of The Dalles for which certain individuals were liable in the very least for property damage, and the viciousness of it all as one sees what happened in mo-

---

7. The objections taken by Pineapple are listed herein as Appendix "B".

tion pictures of the events points to exemplary damages as against certain individuals. But in its judgment, which is not our province, Pineapple did not focus on the damage at the dock, but let the case go on an all-or-nothing basis. That being true, it cannot complain that the jury failed to hold the rank and file responsible.

The injustice of the case is that one or more leaders, who were officers or agents of International and Local and who, we think, probably triggered the whole operation, escaped individual liability. As to their exoneration, there was probably an inconsistency in the verdict; but, as we have held, it is a case where the jury had a right to be inconsistent. But finally we cannot say there was inconsistency.

Affirmed.

### Appendix "A"
### Extracts from Pretrial Order

Plaintiff's Contentions

1. That the defendants International and Local 8 were citizens and residents of states or territories of the United States other than Hawaii at the commencement of this action and ever since and now are such citizens.

2. That at all times herein mentioned the duly authorized officers and agents of defendant International were and now are engaged in representing and acting for employee members of its affiliated Local 8 in the District of Oregon.

3. That at all times hereinafter mentioned Hawaiian Local was engaged in a labor dispute with certain employers in Honolulu, Territory of Hawaii, and the members of said Hawaiian Local were out on strike; that plaintiff and said Isleways, Ltd. were not members of said group of employers with which said Hawaiian Local was engaged in a labor dispute.

4. That at all times herein mentioned plaintiff was not involved or engaged in any labor dispute with its own employees, with the Hawaiian Local, or with the defendants; nor was Isleways, Ltd. engaged in any labor dispute with its own employees, with the Hawaiian Local, or with the defendants.

5. That prior to the acts of the defendants hereinafter complained of:

(a) Plaintiff had chartered a certain ocean-going barge and caused it to be loaded at Honolulu, Territory of Hawaii, by employees of Isleways, Ltd. with a cargo of approximately 115,000 cases of pineapple of a value of approximately $687,700.00 for shipment and delivery to processors of fresh fruits in California.

(b) Plaintiff caused said barge to be towed to the Pacific Coast by an ocean-going tug "Ono" owned and operated by Isleways, Ltd. and thence into the Columbia River where it was towed by a river towboat to the terminal of the port of The Dalles at The Dalles, Oregon, where said barge with its cargo arrived on September 24, 1949.

(c) Plaintiff had made an agreement with the port of The Dalles prior to the arrival of the barge and her cargo of pineapple at the port of The Dalles whereby the port of The Dalles undertook to discharge and unload the said cargo and to load the same upon railroad cars and trucks for a shipment to San Jose and to other points in California; in accordance therewith, the port of The Dalles assigned to a group of its own employees the work involved; and that at all times herein mentioned there was no order or certification of the National Labor Relations Board determining the bargaining representative for the employees of the port of The Dalles who were assigned to the above work.

(d) Plaintiff had similarly made arrangements with interstate truck and rail common carriers to handle said cargo of pineapple at the port of The Dalles and to transport the same to San Jose and other points in California and had entered into an agreement with a crane company for the services of a derrick and an operator therefor at the port of The Dalles.

(e) All the above arrangements and agreements had been made so as to commence the unloading of said pineapple from said barge and the loading of the

same upon railroad cars and trucks on September 26, 1949.

6. That the defendant International, acting through its officers and agents and Local 8, and the defendant Local 8, acting through its officers, agents and members, and the individual defendants combined and conspired between August 22, 1949, and October 30, 1949, to boycott plaintiff's cargo of pineapple, to injure and damage plaintiff's business and property, to prevent the plaintiff from unloading or causing to be unloaded its cargo of pineapple and from shipping or having the same shipped by interstate common carriers from the port of The Dalles, Oregon, to San Jose and other points in California, and to violate Sections 303(a) (1) and 303(a) (4) of the Labor Management Relations Act of 1947, and that pursuant to said combination and conspiracy and in furtherance thereof the defendants engaged in and induced and encouraged the employees of employers engaged in unloading said barge and employees of employers engaged in transporting freight by rail and by truck between the state of Oregon and California to engage in a concerted refusal in the course of their employment to refuse to transport, handle or work on or perform any services in connection with plaintiff's cargo, with an object of forcing and requiring plaintiff and Isleways, Ltd., to cease doing business with said employers and with persons in the State of California to whom said cargo was being shipped, and other states, and of forcing and requiring said employers and persons to cease using, handling, transporting or otherwise dealing with plaintiff's pineapple and to cease doing business with plaintiff and with Isleways, Ltd.; and with the further object of forcing and requiring the port of The Dalles to assign the particular work of unloading said barge and of loading the cargo on railroad cars and trucks to members of defendant Local 8 rather than to its own employees; and the defendants committed the following acts.

(a) Defendants called upon the Commissioners of the port of The Dalles in order to persuade and force the said port to breach its aforesaid agreement with the plaintiff and to refuse to permit the docking or unloading of plaintiff's barge at the port terminal, and defendants called upon and communicated with interstate truck and rail common carriers and with the crane company to persuade and force said employees and persons not to handle or to haul plaintiff's cargo of pineapple.

(b) Defendants further called upon and communicated with officials and representatives of the labor organizations representing the employees of said interstate truck and rail common carriers and with the employees of said crane company to persuade and force said employees to engage in a concerted refusal in the course of their employment to transport, handle, work on, or to perform any services on plaintiff's cargo of pineapple.

(c) Commencing September 26, 1949, the defendants placed and maintained pickets at the entrance to the terminal of the port of The Dalles.

(d) Defendants on September 28, 1949, at about the hour of 2:00 P.M., forcibly and violently overran and thrust aside the police officers of the City of The Dalles who were on duty at the entrance to the terminal of the port of The Dalles and staged a riot upon the docks and in the warehouses of the port of The Dalles in which more than 100 members of the defendant union Local 8 participated; said defendants, many of them carrying knives, cargo hooks, 2 x 4s, axes and crowbars and other dangerous and deadly weapons, beat and injured employees of the plaintiff and other persons and damaged and wrecked trucks and a derrick belonging to or leased by plaintiff and damaged and threw into the Columbia River approximately 409 cases of pineapple, each case consisting of six No. 10 cans, which pineapple was wholly lost to the plaintiff; said defendants further cut and destroyed the hawsers holding the said barge to the dock and set the barge adrift.

(e) Defendants on September 29, 1949, proceeded generally from the City of Portland, Oregon, to The Dalles and caused additional members of defendant Local and of other local unions affiliated with International, exceeding 400 in number, to proceed to The Dalles and to patrol the streets of the City of The Dalles for the purpose of again and further dissuading and intimidating employees of employers present at the dock of the port of The Dalles from further attempting to discharge plaintiff's cargo and transport the same to California.

(f) Defendants on October 20, 1949, resumed their picketing of the entrances to the port of The Dalles.

(g) That the defendants discontinued their picketing of the port of The Dalles on October 27, 1949, but continued to induce and encourage plaintiff's employees and the employees of other employers present at the port of The Dalles to refuse to handle or perform any services in connection with plaintiff's cargo.

7. That as a result of the foregoing activities of the defendants in furtherance of their combination and conspiracy:

(a) The employees of the port of The Dalles of the interstate truck and rail common carriers and the crane company concertedly refused on September 26, 1949, and thereafter to handle, transport or perform any services in connection with plaintiff's cargo of pineapple, and plaintiff's employees likewise concertedly refused in the course of their employment to perform any services from September 28, 1949, until October 19, 1949, and from October 20, 1949, until October 27, 1949.

(b) Plaintiff was forced to discontinue any attempts to discharge or to have discharged its cargo and to transport the same to the State of California between September 26, 1949, and October 30, 1949, and was forced and required to cease doing business with the various employees mentioned above and with various processors of fresh fruits in California who in turn were forced to cease doing business with plaintiff.

(c) The defendants succeeded in forcing the crane company to breach its agreement with the plaintiff and to cease doing business with it from September 26, 1949, on, and in causing the port of The Dalles to refuse to perform its agreement with the plaintiff and to refuse to allow the plaintiff to discharge a cargo of pineapple from September 28, 1949, until October 19, 1949, and from October 20, 1949, until October 27, 1949.

(d) The defendants succeeded in persuading the interstate truck and rail common carriers not to transport or handle plaintiff's cargo of pineapple and forced said operators to cease doing business with plaintiff from September 26, 1949, on.

8. That as a direct and proximate result of the aforesaid activities of the defendants and the consequences thereof, the plaintiff was injured in its business and property and sustained damages thereto, which were wilfully and deliberately inflicted, in the amount of $234,280.29, together with attorney's fees in the amount of $25,000.00, in the following respects:

(a) Except for the above described activities of the defendants, plaintiff would have been able to commence the delivery of a portion of its cargo of pineapple to its Barron-Gray Packing Company Division at San Jose, California, for use in the preparation of fruit cocktail, which plant had purchased large quantities of perishable fruits such as peaches, pears, cherries and grapes for use in the preparation and canning of fruit cocktail; but because of the failure to receive the delivery of the pineapple on September 27, 1949, said fresh fruits were in immediate danger of spoiling and said plant was therefore compelled to process and can all of said fresh fruits without the addition of the said pineapple, and upon the receipt of a portion of said cargo of pineapple on and after November 1, 1949, was compelled to re-process the aforesaid fresh fruits in order to add the pineapple in the preparation of fruit cocktail, all of the said processing and reprocessing costing plaintiff an additional $147,611.99.

(b) Plaintiff was compelled to pay charter hire of the ocean-going tug "Ono" and of the said barge for a period of 40 days while they were idle, at a cost of $720.00 and $230.00 per day, respectively.

(c) Plaintiff was compelled to pay the salaries, wages and expenses of its officials and employees concerned with said cargo, the cost of repairs to the trucks, derricks, and other equipment damaged by the defendants, the truck hire, telephone, telegraph and long distance charges, fees and expenses of legal and public relations counsel and other miscellaneous expenses.

(d) Plaintiff lost 409 cases of pineapple valued at $5.9829 per case.

(e) Plaintiff was compelled to truck a large quantity of pineapple to Portland to be there loaded on railroad cars at an additional cost of $2298.56.

(f) Plaintiff was compelled to employ special police officers to protect its property from damage and its employees from injury at a cost of $1884.32.

(g) Plaintiff was forced to incur medical and hospital expenses in caring for its injured employees.

(h) Plaintiff has been compelled to employ attorneys in the preparation, institution, maintenance and prosecution of this action, and will incur expenses and fees for such services in the amount of $25,000.00.

Defendants' Contentions

(1) That the amended complaint and plaintiff's contentions do not state a claim upon which relief can be granted against any of the defendants, in that there is no federal common law tort of conspiring to boycott a business or to injure a business.

(2) That defendants International and Local 8 lack capacity to be sued as entities.

(3) The Court lacks jurisdiction over the person of the International, in that it is an unincorporated association with its headquarters and principal office located in the State of California, and service of process upon it is insufficient.

(4) That service of process upon defendant Local 8 is insufficient.

(5) That as a matter of law plaintiff is not entitled to seek or to recover attorneys' fees against defendants.

(6) Defendants deny all of plaintiff's contentions, except the facts heretofore admitted, and put plaintiff upon proof thereof.

(7) Defendants deny that any conspiracy of any kind was entered into between any of the defendants hereto.

(8) That said Hawaiian Pineapple Company and Isleways are wholly owned subsidiaries and alter egos of Castle & Cook, Limited, Theo Davies, Alexander-Baldwin and Matson Navigation Company and, as such, any strike referred to in said cause of action was a primary strike and not violative of any section of the Taft-Hartley Act or of any general or common law of the United States.

(9) That any acts done and performed by said defendants were done and performed for the purpose of achieving legitimate ends of collective bargaining and the legitimate ends and purposes of trade unionism, namely, the prevention of breaking down the wages and working conditions of the membership of defendant Local 8.

(10) That diversity of citizenship is not shown or pleaded, defendants contending that said plaintiff has qualified as a corporation to do business in the State of California and maintains an office in the State of California; defendants alleging and contending that defendant International Longshoremen's & Warehousemen's Union is a citizen and resident of the State of California; both said Hawaiian Pineapple Company and said defendant International Longshoremen's and Warehousemen's Union being residents and citizens of the State of California, having their principal offices in the City and County of San Francisco, State of California.

(11) That said defendant Matt Meehan at no time was the agent or repre-

888

sentative of the defendant "International" in and about the matters as set forth in plaintiff's said contentions.

(12) That neither said defendant Local 8 nor any of the said individually named defendants were the officers, agents or representatives of said International in relation to any of the matters set forth in said plaintiff's contentions.

(13) That each and all of said defendants deny that they either singularly or collectively or in concert with each other did or performed any of the acts or things set forth in plaintiff's said contentions.

(14) That the amended complaint and plaintiff's contentions do not state a claim upon which relief can be granted against any of the defendants, in that the Port of The Dalles is not "an employer" or "other person" within the meaning of Section 301 of the Taft-Hartley Act.

(15) That in this same connection the Court lacks jurisdiction over the person of the International, in that none of its duly authorized officers or agents are engaged in representing or acting for employee-members on behalf of the International within this district.

(16) That the amended complaint and plaintiff's contentions do not state a claim upon which relief can be granted against defendant Matt Meehan and all other individual defendants who have been heretofore served with process, in that Section 303 of the Taft-Hartley Act authorized actions for damages against labor organizations only and not against individuals.

(17) That the court lacks jurisdiction over the person of the International, in that none of its duly authorized officers or agents are engaged in representing or acting for employee-members on behalf of the International within this district.

(18) Defendants contend plaintiff could have purchased ample pineapple from other sources without money loss and thereby minimize damages.

(19) Defendants contend plaintiff could have refrained and refused to buy large quantities of fresh fruit in 1949 under its contracts to purchase fresh fruit from growers thereof without money loss and thereby minimize damages.

Issues

The issues which then follow in the pretrial order are as follows:

(1) Do plaintiff's contentions and the first, second and third count in the amended complaint state a claim against defendants upon which relief can be granted?

(2) Can the International and Local 8 be sued as entities under plaintiff's contentions and under the amended complaint?

(3) Does the court have jurisdiction over the subject-matter of plaintiff's contentions and over the persons of the defendants?

(4) Can attorneys' fees be awarded to plaintiff in this alleged cause of action?

(5) Was there any conspiracy to injure the plaintiff in its business, as alleged, which said conspiracy was participated in by the defendant International, the defendant Local, the defendant individuals or any of them?

(6) Did the International engage in the acts and conduct alleged by plaintiff?

(7) Did Local 8 engage in the acts and conduct alleged by plaintiff?

(8) Did the individual defendants engage in the acts and conduct alleged by plaintiff?

(9) If so, did the alleged acts and conduct cause the consequences claimed by plaintiff?

(10) If so, were such acts and conduct the proximate cause of damages alleged to have been sustained by plaintiff?

(11) If so, what was the amount of the damages that plaintiff allegedly sustained?

(12) Was either Local 8 or any of the individual defendants named the authorized representative or agent of the International?

(13) Was the Hawaiian Pineapple Company a subsidiary of Castle & Cook or any other member of the Big Five and, therefore, the strike as alleged, if any, a primary strike within the meaning of the Taft-Hartley law?

(14) Was the purpose and objects of Local 8 at The Dalles to protest the breaking down of working conditions and wages and, therefore, a legitimate purpose of collective bargaining and picketing within the meaning of the Taft-Hartley Act?

(15) Is the Port of The Dalles a "person" or "employer" within the meaning of the Taft-Hartley Act as heretofore set forth in defendants' contentions and in our motion to dismiss?

(16) Were all of the alleged acts allegedly done or performed by any of the defendants, either singularly or collectively, violative of any right or rights of the plaintiff?

(17) Were any of the remaining defendants acting as agent, officer or representative of the defendant International?

(18) Was there any conspiracy to injure the plaintiff in its business, as alleged, which said conspiracy was participated in by the defendant International, the defendant Local, the defendant individuals or any of them?

(19) Did the Hawaiian Pineapple Company, Barron-Gray Division, at San Jose, California, neglect and refuse to purchase large quantities of fresh fruit under its fresh fruit contracts in 1949, which it could have done without money loss, and thereby minimize damages?

(20) Did the Hawaiian Pineapple Company fail to purchase pineapple from other sources and thereby fail to try and minimize damages?

(21) Does the court have jurisdiction of the subject-matter and of the defendants?

(22) (a) Did the defendants engage in a combination and conspiracy to boycott plaintiff's cargo and to injure its business, etc. and engage in various acts and conducts in furtherance thereof as alleged by plaintiff?

(b) Did the defendants engage in a combination and conspiracy to violate Section 303(a) (1) of the Labor Management Relations Act in the manner complained of by the plaintiff?

(23) If so, did the alleged combination and conspiracy and the acts and conduct in furtherance thereof cause injuries to plaintiff's business and property?

(24) If so, did such injuries cause plaintiff to suffer damages in the sum of $234,280.29, together with reasonable attorney's fees in the amount of $25,000.-00?

(25) Were such injuries intentionally and wilfully inflicted?

### Appendix "B"

Objections of Hawaiian Pineapple Company to Trial Court's Instructions (extracts from transcript of trial).

Mr. Krause (of counsel for the plaintiff):

\*　　\*　　\*　　\*　　\*　　\*

"Then the Plaintiff Hawaiian Pineapple Company will take an exception to the instruction that there can be no verdict against the individuals in that case unless the unions are also found liable, because there is a cause of action stated against them that was broader than a conspiracy to restrain trade, and that is to just physically stop a business operation in connection with the riot and other activities that they engaged in. That was one of the counts under the original complaint, and it seems to me that they could bring in a verdict in the Hawaiian Pineapple Company case even though they did not bring one against the unions.

"Then my second point is the failure to instruct in the Hawaiian Pineapple Company case that the plaintiff could recover against the individuals and/or unions on a theory other than the Taft-Hartley Act, because there was a diversity of citizenship and they engaged in physical activities that prevented us from carrying on our business which

they were in no event, under any theory of labor dispute or anything else, entitled to engage in. We would be entitled to recover on that theory if there were no Taft-Hartley action involved here.

"Those are the only things that we feel the Court has not covered."